### ATLANTIC COAST LINE R. CO. et al. v. UNITED STATES.

#### No. 10423.

Circuit Court of Appeals, Fifth Circuit.

Jan. 13, 1943.

Rehearing Denied Feb. 10, 1943.

John B. Sutton and G. L. Reeves, both of Tampa, Fla., for appellants.

Roger P. Marquis, Joseph F. McPherson, and Vernon L. Wilkinson, Attys., Department of Justice, and Norman M. Littell, Asst. Atty. Gen., all of Washington, D. C., and H. S. Phillips, U. S. Atty., of Tampa, Fla., for appellee.

Before SIBLEY, HOLMES, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

A narrow peninsula about ten miles long extends southwardly from the City of Tampa, Florida, between Tampa Bay and Hillsboro Bay. At its southwestern corner is Port Tampa, a town of 1100 inhabitants, which is reached by a paved highway and the tracks of the Atlantic Coast Line Railroad Company, and there the railroad tracks stop, and the depots and terminals of the railroad are. Beyond these, and extending continuously some four miles across the south end of the peninsula is a strip of land of 986 acres which is still in a state of nature, mostly low and marshy, unused, and in its present condition good only for hunting and fishing. The title to this land appears to be in Atlantic Land and Improvement Company, a corporation said to be wholly owned by the Railroad Company. The United States desired to use the southern end of the peninsula as an army air base, and on October 9, 1939, filed proceedings to condemn it, and in due course paid into court $173,000 as the compensation estimated to be due for the 986 acres and about 5,000 acres belonging to others, and under an order of possession took the land over. Several landowners contested the value estimated for their lands, among them the Railroad company and the Improvement Company, and a jury was impanelled to try the issues. The two named Companies, with a mortgagee of their lands, asked a separate trial, which was denied. A portion of their answer was stricken. However, a separate period for the hearing of the testimony about their land was accorded, the jury found compensation for it separately, (aggregating about $7,000), and a separate judgment was entered. On the trial the judge admitted over objection the testimony of three expert appraisers for the government, who thought the coastal lands of little value, and hardly usable at all, but that if usable the best use was for residential purposes, and, giving fully their reasons, they thought a fair value was from $5 to $10 per acre. For the owners three expert appraisers were offered who had made a very elaborate study of the surroundings, including the whole of the coasts of Hillsboro Bay, and found that such lands had changed hands but seldom, the land in controversy having been held for the Railroad Company and its predecessor for fifty years; and no tract of like character and size had been sold within ten years before this taking except one in 1929 and one in 1932. The sale in 1929 they thought was influenced by the boom conditions which had obtained in Florida, and ought not to be considered as comparable to present conditions, but that in 1932 was in the depression and general conditions were more like those in 1939. The prices paid in these sales were not stated. They considered also "offerings of similar lands", without stating what the offers were, by which the judge said he understood was meant the prices which the owners were definitely offering to take. These appraisers also considered the history and development of Port Tampa's waterfront properties, the rate of absorption of them since 1915, leases of them after development, sales and offerings as undeveloped, the cost of development of these lands, their nearness to the existing ship channel and to a supply of labor, and the size of the whole tract as affecting its desirability, and the time of probable demand for it. They did not consider its value as railroad terminal property, not thinking themselves competent to deal with that, but considered it mainly as for prospective deepwater industrial sites, especially for fertilizer and chemical and oil plants and the like, which might be a nuisance nearer to the City of

Tampa. They were not allowed to state an opinion as to value at the time of the taking because the court thought that some of the things considered, mentioning especially the "offerings" of like property, could not be considered by the jury, and ought not to be considered by these witnesses, and that an opinion founded in part thereon ought not to be expressed. . The witnesses were not asked to eliminate the objectionable factors and express an opinion not based on them. Their opinions were allowed, however, as to the value ($15 to $30 per acre) of some lands which these witnesses thought usable for residential purposes, but not the major portion whose best and most probable use they thought was industrial.

Other witnesses were offered to show the peculiar value of this land to the railroad system and as a part of it, because of which it had been acquired, and held for fifty years, and the practice of railroads to have such land reserves to produce and control industrial traffic in the long future. Proof of a value for this purpose was refused. The real estate agent of the Railroad Company also was not allowed to testify to a value for that purpose, but did testify that in view of circumstances which he detailed similar to those mentioned by the expert appraisers, (except that he did not consider offers of this or other lands), the land was suitable for industrial purposes and of a value for those purposes of $858,445. It developed that he was including a "severance damage" of $429,222, which he thought would be visited upon the railroad system by depriving it of the prospective traffic likely to be developed by industries, and that he was valuing the land alone at $429,222. All of his testimony was finally stricken out as immaterial and not probative. Other railroad officials offered to testify to a practice of railroads to have reserve lands like these, and as to the investment in the Coast Line System and its traffic in Florida, and that Florida is a fast growing State; that in recent years the tendency of industries was to remove to the South, and into Florida. The General Manager offered to testify that in the five years prior to Oct. 9, 1939, Florida had experienced a phenomenal development both inland and on the waterfront. All this was ruled out as irrelevant. The result was that all the evidence offered for the United States was admitted and all offered for the owners, except the value of some of the land for residential purposes,

was ruled out, and the jury found values in line with the contentions of the United States. Because none of the $173,000 deposited in court was specifically for this land and nothing had been received for it by these owners, full interest was claimed since the taking, but was denied. This appeal followed.

The specified errors are very numerous. We announce conclusions which cover those of them which we regard as necessary to be decided. The portions of the answer srticken were argumentative and pleaded evidence, so that we will not reverse their elimination, but the striking of them will not be taken as an adjudication of their merits.

■ A condemnation proceeding brought against owners of several tracts of land is one suit. The several answers may in the discretion of the court be given separate trials. Discretion in this case was exercised by impaneling one jury for all (touching the selection of which no point is made), and then giving to these appellants in effect a separate trial before that jury, followed by a separate verdict on their land, and a separate judgment. We find no such confusion or prejudice to have resulted as would show an abuse of discretion.

■ Interest from the date of taking is usually a part of the just compensation to be paid and cannot be denied by statute. Seaboard Air Line Railway v. United States, 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664. The Act of Feb. 26, 1931, Sec. 1, 46 Stat. 1421, 40 U.S.C.A. § 258a, provides that an estimated compensation shall, if immediate possession is taken, be paid into court for the use of the owners, and that interest shall not be allowed on so much as shall have been paid into court. It is further provided that an owner may apply to the court for such part of the money as is intended for him, and thus obtain the use of his money, the apportionment between several owners being left to the court. The money thus deposited is not offered or accepted as in full of the demand, but is without prejudice and only to escape liability for accruing interest. These owners made no application to the court for their portion. It appears that all the tracts were separately appraised and the $173,000 was the total of the appraisement. It is not denied that each owner could have learned the figure at which his property was appraised, if indeed he did not know it. The

court could very easily have apportioned the fund on deposit. That these appellants did not promptly receive what was deposited for them is due to their own fault, and the statute which declares they shall have no interest on what they could thus have gotten is not violative of the constitutional right to just compensation.

The court did not err in permitting the witnesses for the United States to testify that in their opinion all the lands in dispute, if valuable for any use, were most valuable for residential purposes, and to state their opinion of that value, and their reasons. The sum to be paid the owner does not depend upon the uses to which he has devoted it, or if he is not using it at all upon the uses to which he expects to devote it, but is to be ascertained on just consideration of all the uses to which it is suitable. Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236; McCandless v. United States, 298 U.S. 342, 56 S.Ct. 764, 80 L.Ed. 1205. Evidence as to all such uses may be offered by either side, the jury being the final judge under proper instructions as to what uses it was suitable for, and was most valuable.

The court did not admit the testimony of the expert appraisers offered by the owners that the lands were suitable for deep-water industrial sites, and their opinions of value for that use in October, 1939. The reason for rejecting their opinions was that they took into consideration two sales remote in time and leases of other like lands and mere offers to sell like properties, by which last expression we understand is meant the "asked price" of owners, no buyers appearing. Offers made by buyers to owners would appear to be better evidence to show the value was at least equal to the offers, yet on full consideration it has been held that such offers are not, because of the difficulties pointed out, any evidence of value. Sharp v. United States, 191 U.S. 341, 24 S.Ct. 114, 48 L.Ed. 211. So also an actual sale remote in time affords no standard. A lease, being a sale of a use for a term of years, is a partial sale, and we see no reason why, when of similar property and not remote in time or place, it may not be considered to show whether such property may be profitably used in that way. A lease for an annual rental is like renting a farm, and income so realized or realizable is recognized as a pertinent subject of enquiry in Monongahela Navigation Co. v. United States, 148 U.S. 312, at page 328, 13 S.Ct. 622, at page 627, 37 L.Ed. 463. "The value of property, generally speaking, is determined by its productiveness,—the profits which its use brings to the owner. Various elements enter into this matter of value," the court mentioning natural richness of soil; susceptibility to easy use, or only by large expense; nearness to centers of population; large rentals or small; demand, and the like. When the effort is not to show the sale of other property, or its lease, as a standard of value, but these are referred to by a witness experienced in dealing with such properties in the neighborhood and qualified to have an opinion on values, merely as things in his knowledge which contributed to the opinion which as an experienced man he holds, his opinion ought not to be rejected from evidence, but ought to go to the jury for their consideration of its reliability, under instructions. An opinion, however, largely based on owner's asking prices ought to be rejected, for the courts have decided that even offers by buyers are too unreliable to be considered. These expert witnesses did not say what opinion they had independent of these askings, nor did they say whether their opinion was much or little affected by them. For this reason only we think their opinions of value were properly rejected.

It is otherwise as to the real estate agent of the railroad. He made no reference to the offers of this or other property, but based his opinion wholly on the physical surroundings, his knowledge of the locality and what he thought were the prospects of development. His idea of severance damage was properly rejected, for this land is not a part of the Atlantic Coast Line transportation system and has never been used by it. It is not even owned by the Railroad Company but by a separate corporation. Severed in use and ownership from the transportation system, it cannot so affect the system as to involve legal injury to the system by its taking. But the value of the land alone for industrial purposes, to which he said it was suited, he also stated, and his opinion, with his reasons, was proper evidence for the jury. The objection that such use was too speculative ought not to exclude the evidence, but the question ought to be submitted to the jury. A reasonable argument is made for this as a probable use. It is not more speculative than is the use of the land for residence. The land has not been used

hitherto, and must be improved, for either purpose. It was bought and is being held for industrial use. Similar lands are being so used, the necessary improvement being often done by lessees. The Tampa territory has growing business enterprise, as has Florida, under the evidence. The witness has something to go on in anticipating a demand for this property in the future. A fertilizer plant, a chemical plant and an oil plant have recently been established. This is undeveloped property in a state of nature, and such property nearly always takes its value from its supposed future, not yet realized. Compare Sharp v. United States, 191 U.S. at page 357, 24 S.Ct. 114, 48 L.Ed. 211. Such speculative elements are discussed and held to be proper to consider if they do in fact influence the value at the time enquired about, in Montana Railway Co. v. Warren, 137 U.S. 348, 349, 11 S.Ct. 96, 34 L.Ed. 681. An undeveloped mineral vein was there in controversy, supposed but not demonstrated to traverse the property taken. The witnesses were allowed to testify to opinions of value which involved it. The court, upholding the admission of the evidence, discussed at page 353 of 137 U.S., at page 97 of 11 S.Ct., 34 L.Ed. 681, the necessary uncertainties in valuing real estate, and especially that which is remote and undeveloped, thus: "At best, evidence of value is largely a matter of opinion, especially as to real estate. True, in large cities, where articles of personal property are subject to frequent sales, and where market quotations are daily published, the value of such personal property can ordinarily be determined with accuracy; but even there, where real estate in lots is frequently sold, where prices are generally known, where the possibility of rental and other circumstances affecting values are readily ascertainable, common experience discloses that witnesses the most competent often widely differ as to the value of any particular lot; and there is no fixed or certain standard by which the real value can be ascertained. The jury is compelled to reach its conclusion by comparison of various estimates. Much more so is this true when the effort is to ascertain the value of real estate in the country, where sales are few, and where the elements which enter into and determine the value are so varied in character. And this uncertainty increases as we go out into the newer portions of our land, where settlements are recent and values formative and speculative. Here, as elsewhere, we are driven to ask the opinions of those having superior knowledge in respect thereto. * * * It is difficult to lay down any exact rule in respect to the amount of knowledge a witness must possess." Knowledge of the land and its surroundings was held necessary, but not necessarily knowledge of sales. "Indeed, if the rule were as stringent as contended, no value could be established in a community until there had been sales of the property in question, or similar property. After a witness has testified that he knows the property and its value, he may be called upon to state such value. The means and extent of his information, and therefore the worth of his opinion, may be developed at length on cross-examination. And it is fully open to the adverse party, if not satisfied with the values thus given, to call witnesses in the extent of whose knowledge and the weight of whose opinions it has confidence." We have quoted this at length because we are here dealing with remote and undeveloped property little dealt in, and the procedure is indicated by the Supreme Court as to how the evidence ought to be submitted to the jury, who under proper instructions are to weigh the facts and opinions given them, along with their inspection of the property, and arrive at their own conclusion as to the fair value. We think in the interests of justice a new trial should be, and it is hereby, awarded.

Judgment reversed.