**GWATHMEY et al.**

v.

**UNITED STATES.**

No. 14377.

United States Court of Appeals
Fifth Circuit.

Aug. 25, 1954.

R. F. Maguire, J. R. Wells, J. R. Wells, Jr., of Maguire, Voorhis & Wells, Orlando, Fla., for all appellants except Louis Fischer.

Noah B. Butt, Wm. G. Akridge, Cocoa, Fla., for appellant Fischer.

Harold S. Harrison, Roger P. Marquis, Attys. Dept. of Justice, Washington, D. C., Perry W. Morton, James M. McInerney, Asst. Attys. Gen., William D. Jones, Jr., Special Asst. to Atty. Gen., Allen L. Poucher, Asst. U. S. Atty., Jacksonville, Fla., Reginald W. Barnes, Atty. Department of Justice, Washington, D. C., for appellee.

Before STRUM and RIVES, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

Appellants[1] have appealed from the judgments in two consolidated condemnation suits. The group appellants list 76 alleged errors which they reduce into 14 questions. Fischer, the individual appellant, raised many of the same questions and four additional errors. But the principal issue, and the main problem we deem it necessary to discuss, was raised by all appellants: Did the trial judge exercise a proper discretion first, in consolidating the two suits, and second, in refusing appellants' requests for separate trials and allowing the case to be presented before one jury which retired for deliberation only after all evidence of value had been entered on all property condemned?

On April 15, 1950, at the request of the Secretary of the Air Force, the United States filed suit to condemn property in the Cape Canaveral area on the eastern coast of Florida for military use. It described the area sought by section, township and range and listed separately the parties who claimed the land "in whole or in part". The right to amend was reserved for the bringing in of additional parties if necessary. The record is not clear but it appears the original complaint did not identify the defendants with any specific tracts or parts of the property. The complaint did not inform the owners clearly of the exact tracts to be taken and their descriptions until eight amendments had been filed, the last on March 30, 1951. Not until then was the whole property completely broken down into the tracts used in the trial.

In the meantime, on June 2, 1950, a second suit had been filed to condemn an additional area, the need for which had been determined. Some of the same defendants in the first suit were found to be owners of tracts or parts thereof covered by the second; but the numbers and

ownerships were not clearly distinguished in either complaint. It was assumed by the witnesses and the trial court that some 12,000 acres were involved.

The property sought was a peninsula jutting into the Atlantic Ocean, measuring some four and one-half miles at its widest point, and about seven miles from north to south, having an ocean frontage estimated by a government witness as 50,000 feet. The lands are situated between the Banana River and the Atlantic Ocean, and the area as a whole was sparsely populated at the time of taking, although one of the appellants (Port Realty Company) had elaborate plans partially executed for the development of a city. Several sub-divisions had been opened years before during the boom which preceded the Great Depression, but some of these had reverted to the natural state. There were piers and docks along parts of the beach, and appellant Fischer, among others, headquartered commercial and sport fishing operations there. He contended that his pier was located in the heart of the Canaveral shrimping grounds, and supported this with further proof that the area was unique in this respect and had exceptional possibilities for development.

The Government, in the two suits, had broken the area down into 933 separate tracts, numbered consecutively. By the time preliminary pleadings and orders were finished it appeared that 236 separate tracts would be contested as to value. A pre-trial conference was then had to determine the contested facts and method for conducting the trial, mainly as to values, which consumed two full days, September 6 and 7, 1951. The discussions at the conference centered around a previously prepared plan submitted by counsel for the Government. It went into great detail, including anticipated rulings

1. Port Realty Company; Richard P. Robbins, as Trustee; William S. Hobbs; Marcus Siskind; G. T. Gwathmey; Hazel Wakefield Jordan; Philip S. Day; Day and DeWinkler; Frank C. and Louise G. Robinson; Arthur I. Gould; J. I. Crowder; and Louis Fischer. All except Fischer have common counsel and filed a joint brief, and are referred to where necessary as the "group appellants". Fischer was separately represented and filed a separate brief.

on the admissibility of evidence, and sought to define precise limitations for the conduct of the trial. There was much discussion of these proposals, particularly as to method of conducting the trial. Several counsel for landowners argued strenuously against one massive trial, in which the jury would make no decision until completion of all the evidence. Several alternative methods for breaking the trial down into smaller segments were suggested, it being contended that otherwise the landowners would be deprived of due process if the jury were given the impossible task proposed by the Government.

Notwithstanding these arguments, the court consolidated the two cases and ordered one trial of these hundreds of claims before a single jury. The ruling to this effect is paragraph 28 of the pretrial order.[2]

Before beginning the trial, the jury was taken to the scene and shown the property involved in such detail as was possible in the time consumed. However, when the first suit was filed, the Government was given possession, and the owners of improvements, such as wharves and other accessories, ceased to keep them in good repair. By the time the jury had been selected and was taken to view the property, more than a year had elapsed and the claimants contended there had been substantial deterioration due to the salt and other elements in the wind and water. Substantial proof to support these claims was offered, but some of it was ruled out. These rulings form the basis of errors strongly urged.

As stated earlier, the trial opened with 236 tracts contested, the owners of which were represented by 12 separate attorneys or law firms. Taking of evidence on

issue of value alone consumed some seven weeks, producing a record of 6,248 pages in 12 volumes. The jurors were allowed to take notes as the trial progressed, and a large map of the whole area was displayed before them. At the close of the evidence, argument of all counsel and instructions to the jury, they were handed forms for their verdict prepared in detail, with blanks left for inserting the awards to each claimant found by the jury. In each of the two cases, the jury rendered a verdict on the value of the whole area and then broke the total down into separate awards to each landowner by tracts.

It is stated by the group appellants, and not disputed by the Government, that on their 50 separate tracts, the combined total of the *lowest* values by landowner appraisers was $1,702,118.25; while the combined total of the *highest* values on the same tracts by Government appraisers was $297,317; and the total verdict on the 50 tracts was $369,132, some $71,000 more than the Government's top estimate.

Appellants, of course, do not ask that we review the findings of values by the jury as such, simply pointing to the great disparity in the figures; but with considerable feeling they urge that the manner in which these cases were tried amounted to a denial of due process of law.

It is not necessary to emphasize the reasons behind the Constitutional provisions for trial by jury or the requirement that the Government must pay "just compensation" to owners when their property is taken for public use. Jury trials were instituted long before the courts were confronted with modern conditions affecting the value of property. However,

2. "The valuation of the several tracts under contest as to value shall be heard on the question of their evaluation in the numerical order in which they are numbered in Case No. 489, followed by the numerical order in which they are numbered in Case No. 493, except that regardless of whether it be in Case No. 489 or in Case No. 493, where one counsel represents more than one tract under contest as to value, all tracts represented by such counsel shall be heard on the question of their evaluation in their numerical order before any other tract shall be considered, regardless of whether or not all the tracts represented by such counsel run in contiguous numerical order or not."

the reasons for having a jury now in such proceedings are the same, i. e., obtaining the composite judgment of twelve men on the relevant facts. To insure impartial judgment the trial should be conducted in a manner that will enable the jury to understand and comprehend those facts, not alone as to the overall value of a large body of land, such as was involved here, but as to the approximate worth fairly determined of each owner's tract or tracts, including all elements which reasonably contribute to its current market value.

A jury is usually drawn from the body of qualified persons residing in the division of the court in which the trial is held. This includes persons of all walks of life, merchants, farmers, artisans, laborers and all others who, in the judgment of the jury commission, reasonably possess the qualifications required to discharge their important duties. In a case like the present one, the sole question is the fair value of property in many different situations, affected by varying conditions according to its location in the whole area taken, such as improvements, nearness to roads, highways, streams, waterfronts, transportation and numerous other elements which may affect market value. Market value, of course, means what one wanting to buy, but not compelled to do so, is willing to pay, with the corresponding price which the owner who does not have to sell will take for his property. Undoubtedly the law permits including in a single expropriation proceeding several separate properties and owners constituting a single area necessary for the public purpose intended. However, this does not warrant any diminution in the duty to afford each of such individuals fair and reasonable opportunity to put before the jury, or other agency charged with the determination of values, in understandable form, all material facts which experience and common-sense teaches make up those values. Because of the complex and variable nature of such factors in modern conditions, the law very wisely allows the trial judge a broad discretion as to methods which shall be used in accomplishing the best results, and an appellate court should not insist upon substituting its own judgment by selecting something else, merely for the reason it seems a better choice. Much more is required: it must be convinced that the course pursued, when tested by fair standards and conditions, amounts to a denial of due process or a miscarriage of justice.

It is necessary therefore that we look realistically at all of what took place here. The Government filed its first complaint and was given permission to take immediate possession of this large body of land. When the cases were finally at issue and had been consolidated, a dozen separate lawyers and firms were participating, with the usual differences of judgment and opinions as to how the case should be handled. The problems so created were vividly brought out in the pre-trial hearing; and when the two cases were consolidated for the purposes of trial, the complications were multiplied.

Anticipating these difficulties, counsel for the Government, as stated earlier, brought to the pre-trial hearing a comprehensive scheme for conducting the trial most of which plan was adopted and followed by the court below. The only grouping of tracts allowed was according to the lawyers or firms representing owners, although tracts so grouped were often scattered in widely separated areas. This made it necessary for the jury to attempt to remember the evidence brought out by the same lawyer with respect to the properties of one or several owners thus dispersed, and to make notes accordingly, thereby further increasing their burden. (It may be noted at this point that it was the foresight of Government's counsel in bringing to the trial and providing the jury with notebooks to be used for that purpose, which enabled them to take such notes as were actually made, under the limitations of inexperience with which they were handicapped.) These notes are not in the record, and we have no way of knowing how

extensive or pertinent they were to the crucial factors governing value. Any lawyer or judge who has undertaken to keep notes in an ordinary trial between even two or a few litigants, with the use of modern court reporters and the machine-gun like speed of some trial attorneys, can appreciate how difficult it is for even a legally trained mind to place in understandable form anything worthwhile under such conditions. Then, too, we all know the tendency, in spite of a well intended beginning, to lose enthusiasm or to forget to have our pencils keep up with our own thoughts or those which are spurted forth without warning by an opponent. To expect an untrained layman in the first place to know the important points, and in the second, to be able to record them comprehensively, and to keep them intact while handling them each day, (at the end of which they were turned over to the Clerk) requires a good deal of faith in the diligence of an average individual serving as a juror. It is not out of place for us to suggest that had these cases been tried by the judge without a jury in the same manner as was done here, he most likely would have required the court reporter to transcribe at least the most important parts of his notes, especially as to closely contested and widely varying testimony of witnesses of equal credibility and knowledge, and that considerably more time than the three days used by the jury would have elapsed before a final decision.

Government appraisal witnesses broke the whole area down into "value zones", a procedure which they said was necessitated by the magnitude of their task. Aside from the obvious result of arbitrary assignment of tracts to particular zones, this device added greatly to the confusion and to the mass of evidence with which the jury was burdened. Each such witness explained in detail how he arrived at the zones used, the factors which resulted in the values he placed on each zone and the effect of the zon-

ing on the value of individual tracts therein. Without exhaustive quotation we cannot illustrate the problem created by the use of such zones. It should suffice to say that when the cumbersome procedure of trial was further complicated by testimony so organized, the jury was simply swamped by an incredible volume of figures and general data.

Appellant Fischer complained of a situation which we think amply demonstrates the impossible position in which the landowners found themselves. Having been informed that the trial would last an estimated five weeks, that evidence would be presented on tracts in numerical order according to representation by counsel and that no attorneys would be allowed to cross-examine or otherwise participate out of turn, attorneys and owners made no point of being present when the trial was concerned with tracts in which they were not interested. Yet, because of their use of value zones, Government witnesses repeatedly testified as to comparable sales, physical conditions and other value factors relating to one tract while another completely separate tract was being tried. The result was that the Government was able repeatedly to restate and emphasize certain of its evidence as to some controversial areas, with cross-examination either not allowed at all or allowed so long after direct examination that it was totally ineffective. For example, appellant Fischer owned a five-acre tract with approximately 700 feet of ocean frontage, a pier and several buildings—designated as Tract 23. During that portion of the trial allocated to other tracts, Government witness Hall gave considerable testimony on Tract 23, no doubt very damaging to Fischer's claim, although neither Fischer nor his attorney was present in the court room. We quote that testimony in the footnote, and call attention to the emphasis given to the tract number, ownership and condition of Fischer's property.[3]

3. (By Mr. Jones, Government Counsel)
"Q. Now, Mr. Hall, have you got any sales that you took into consideration

along the western area—that is, that you used in your consideration, along the western area of this tract on Banana

The record shows plainly, we think, that the very size of the case as tried, without the additional complexities, was such that the jury must have been over-

River, other than the one that you mentioned up there in the Northwest corner? A. Well, I found this—if you don't mind, I would like to give you the sale of the pier, and *tract 23* and 25.

"Q. Oh, no, sir, because I am attempting to ascertain what it was that you took into consideration in the formation of your opinion. A. Can I give you these sales?

"Q. Yes, sir. A. All right, sir.

"Q. Which you took into consideration. A. I did. Yes, sir. On April 15, 1948, recorded in Deed Book 317, Page 541, the sale from Ogden to *Fisher* (sic). That is *tract 23.*

"Q. *Tract 23?* A. *Yes, sir,* that's the fishing pier with those houses.

"Q. *At the spot where I have my finger on the map?* A. Yes, sir, that's it. The consideration on that sale was *$15,000.*

"Q. Now, Mr. Hall, that sale—did it or not include the pier, *all the facilities* of the pier, *and the buildings* that were in connection therewith? A. It did, yes, sir.

"Q. Are those buildings all there now? A. No, sir.

"Q. Is the pier substantially as it was at the time of taking? A. The pier is, yes, sir, but the buildings have been moved.

"Q. What else was there? Can you tell us something about the buildings that were moved? A. I can give you the details of all of them if you would like.

"Q. I would like for you to do that, *because I think we had a view of that yesterday,* and I woud like, if you can do that, to do that for us *so that we may have that data before us* in connection with this transaction that we have just referred to."

\* \* \* \* \*

"Q. Now, did I understand you to say that this purchase was made *by Mr. Fisher,* which covered the ocean pier and *all the facilities,* and the nine additional buildings, *none of which are there now* —for *$15,000?* A. Yes, sir.

"Q. And when was that sale? A. That was on April 15, 1948." (R. pp. 1444–1447) (Emphasis ours.)

Then on cross-examination by counsel for the owner of the tract then under consideration, the following testimony was given:

"Q. Now, with regard to the tract known as the pier—you testified that that sales prices was on the fifteenth of April, 1948. A. That's in *Tract 23.*

"Q. That is in *Tract 23,* yes, sir. A. I beg your pardon. What was your question?

"Q. What was the date at which you fixed the value on that property as a matter of comparison in this case? A. The date that I fixed the consideration in the deed, sir?

"Q. Yes, sir. A. That deed was dated April 15, 1948.

"Q. And that was the basis of your $15,000 comparative value? A. No, sir. I haven't. There seems to be a contract—I talked to Mr. Akridge, and Col. Butts, and *Mr. Fisher,* on the subject —there *seemed* to have been a trade— the original trade was that they were to pay $15,000, and that they were to put in certain improvements on the property, and that this deed at that particular date was the winding up and closing up of that agreement.

*"Mr. Jones:*

*"Is that the pier tract?*

"Mr. Maguire:

"Yes, sir."

\* \* \* \* \*

"Q. Would it make any difference to you as a comparative value if that was 1943? A. If it was in 1943, why we would possibly not have considered it, sir, as a comparative sale.

"Q. The price, at that time, using $15,000,—there is a vast difference between $15,000 in 1943, and $15,000 in 1950."

\* \* \* \* \*

"The Witness:

*"In 1943 the pier was in much better condition than it is at the date of the taking.* In those days the depression, the so-called depression, didn't hurt the fish business. They were bringing in, as I understand it from *Mr. Fisher,* the owner, the purchaser, that during that period of time when he first got the contract was a most profitable time for running his business, and that is what he purchased the place for—shrimp and fish. By Mr. Maguire:

"Q. You didn't mention that in your direct testimony, did you? A. I saw no reason for it.

"Q. Will you please read my question back to the witness.

*"Mr. Jones:*

*"We object to the question, if Your Honor please, interrogating this witness with respect to Tract 23, inasmuch as counsel doesn't represent Tract 23 and has no interest in it."* (Emphasis ours.) R. pp. 1598–1601.)

whelmed. In fact, during the trial there were so many tracts and so much evidence that the witnesses, the attorneys and even the judge himself seemed to be confused at times. (Vol. III, pp. 1493, et seq.; Vol. IV, pp. 1988, 2101, 2106; Vol. V, pp. 2533, 2534; Vol. VI, pp. 2692, 2694, 2695).

The situation was further complicated by the fact that after the trial began it was learned by the Government that some tracts as originally designated were owned by additional parties, and it was necessary to subdivide them. Also, during the trial, six tracts were disposed of after evidence had been taken, (whether settled or otherwise does not appear) and these were omitted from submission to the jury. Even after the six were excluded, the jury returned verdicts on 238 separate tracts. They, of course, did not have the transcribed record and had to rely entirely upon their recollection of the testimony of values as to those tracts that were left, with such aid as their notes might afford. When furnished with the forms of verdict containing the names of owners and numbers of tracts remaining it is most probable that there were differences in both the notes and recollections of individual jurors.

The task was so overwhelming they must have used whatever method of computation or approximation of values seemed reasonable to all twelve. There also appears to be some significance in the general run of figures used, the total verdict for appellants being approximately 25 per cent above the Government's maximum estimates for the claims and only about 22 per cent of what the owners contended was the lowest average appraisal by their witnesses and experts. Of course, value was purely a jury function when based upon an informed opinion, but because of the manner in which these consolidated cases were tried, we do not believe it was humanly possible for the jury to have a really informed opinion; and it was driven to some other device in selecting the figures. Each owner was entitled to present for the consideration of the jury all of the relevant facts and circumstances which reasonably tended to support his valuation in a manner that they could comprehend, without being confused with others having conditions and elements distinctly different. Even if such a fair hearing should produce little difference in the ultimate outcome, it would at least afford due process, which we do not believe was possible in the circumstances under which these consolidated cases were tried. The figures have the appearance of being largely guesses; and even if it be true, as is often said, that any valuation is at best an opinion or guess, still when the pertinent facts and figures are presented in a manner that the ordinary layman can understand, his guess is at least an informed one.

Against appellants' contention that the procedure employed here denied them due process, the Government argues, first, that any of the plans proposed by appellants would have needlessly increased the length and expense of the proceedings, and, second, that the procedure adopted by the trial court was in accordance with the long-established practice in Florida, citing among other cases, Atlantic Coast Line R. Co. v. United States, 5 Cir., 132 F.2d 959.

■ As we have said, the desirability of minimizing the length and expense of the proceedings is self-evident; and due consideration of those factors is not only permissible but essential. Even so, the *primary* consideration is the individual landowner's Constitutional right to due process and just compensation. Any procedure calculated to save time and expense must at the same time substantially guarantee that the landowner has a fair opportunity to have his compensation determined from the evidence in reasonable proceedings. As between a method of procedure which seriously restricts or prevents the landowner from establishing his claim in order to save time and costs and one which preserves those fundamental rights, the choice is obvious and all reasonable doubt should be resolved in favor of justice.

The Government's contention that reversal here would upset established practice in Florida is equally unavailing. If, in spite of our conviction that these appellants and the other landowners were denied due process, we should approve the procedure followed in this case, we would not only violate our duty to insure proper administration of justice, but we would open the door to greater injustice in future condemnation proceedings. Government acts only through its representatives, and those agents are as susceptible to human limitations as anyone else. If in fact it is the established practice in Florida to curtail such rights of landowners in the interest of Government convenience and economy, it is not unreasonable to assume that those responsible will in future seek even greater restriction in condemnation proceedings. This Court should not give its approval simply to maintain consistency at the sacrifice of fundamental rights.

The opinion in the Atlantic Coast Line case, supra, does not fully reveal the procedure used in disposing of the individual claims as stated in the first syllabus, 132 F.2d at page 962, and it is not clear that the appellant there raised the exact question presented in the present case. However, we take note from the transcript of the pre-trial proceedings here that the judge (who also presided over the Coast Line case) did not agree with Judge Sibley in this respect, but thought this case sufficiently similar to be governed by what he took to be our approval in the Coast Line case.

 Even if we assume that the precise question here raised was decided in the Coast Line case, we do not consider it decisive under the facts in this instance. Whether or not there has been an abuse of discretion, whether or not there has been a denial of due process, are questions which turn on the circumstances of each case. In the Coast Line case, this court found "no such confusion or prejudice to have resulted as would show an abuse of discretion." Here, we are of the opinion that the trial court was so impressed with the desire to save time and expense that its failure to require a reasonable breakdown of the trial prevented the landowners from obtaining a fair determination of values by the jury and was therefore an abuse of discretion.

The practice in some districts, where the Government seeks to condemn in a single suit a large body of land belonging to many owners, is to list separately each owner and his lands and to try the claims one at a time after which the jury retires and returns a verdict while the evidence is fresh in their minds, without being mixed up with other claims. Then other owners and their lands are handled in similar fashion before the same jury, or another if desired and approved by the Court. However, if the same jury is used, it has the benefit of the evidence in the preceding case or cases as well as the values which were previously used, where they are pertinent; and frequently counsel agree that such evidence need not be repeated, thereby saving time. Conceding that more time is required, it cannot be argued that because the Government, or any other body exercising the powers of eminent domain, sees fit to include in one suit the whole area desired, involving hundreds of property owners, the court is justified in denying the same full and fair treatment which would be given a single owner. When the element of time is considered, it is well to remember that a proceeding of this kind it not initiated by the defendant landowners but by the Government or other Agency having the power to condemn which usually wishes to get the property as cheaply as possible; whereas the owners naturally insist upon receiving what they claim is fair value. The court has the right to use all reasonable means to expedite such a trial, so long as it does not seriously curtail or deny fair treatment. Here, if the court had acceded to the request that the cases be broken down into not less than four trials of separately grouped properties of similar type and conditions, with verdicts following each trial, at least some of the confusion would have been avoided.

Our opinion should not be interpreted to require a district court to accept or

158

adopt any particular method for the trial of condemnation suits, or to mean that this court will substitute its judgment in any case wherein similar questions arise. It may well be that upon remand, having been reduced considerably by the failure of many landowners to appeal, this case can be fairly tried in one proceeding before one jury. Like all such cases, that is a question for the trial judge, whose discretion will be disturbed only when we are convinced there has been a clear abuse.

Most of the other points raised by appellants need not be considered, for they either pass out of the case under our ruling on the paramount issue of due process, or they are of such nature that their recurrence is unlikely. (Questions No. 3, 4, 7, 9, 10, 11 and 13 raised by the group appellants; and Question No. 5 by appellant Fischer.) However, there are a few which we think it necessary to discuss for the guidance of the court upon re-trial.

The first of these (Question No. 1 by group appellants) has to do with the testimony of Government witness Register who repeatedly referred to a sale by the United States to Port Realty Company, one of the appellants, as supporting his opinion as to values as of the time of taking. He insisted that in 1949 or 1950 Port Realty Company had purchased 280 acres of the property for which it sought compensation at $20 per acre. Yet, when the deed was produced it disclosed that while the sale was completed in 1949 it was pursuant to an agreement made in 1938. In the meantime supplemental agreements were made before execution of the deed, and the pertinent question was as to when the price actually paid was fixed. Obviously the purpose was to have this transaction considered as an arms length sale within a year of the condemnation of the same property, instead of 11 years earlier toward the end of the depression. There being nothing in the deed itself definitely to the contrary, he assumed that the price was fixed as of the date of the deed. Counsel for appellants objected to this testimony as being too remote and moved to strike it from the record. The motion was denied on the grounds that it involved only the credibility of the witness and weight of his testimony, a problem for the jury. Later, when the 1938 agreement was produced, counsel for appellants tried repeatedly to cross-examine Register as to the soundness of his original assumption that the price was fixed in 1949. Appellants complain that they were so restricted by the court in these efforts, they were never able to expose the fallacy of the witness' contention.

■ The line between competency and weight of the evidence as to values, particularly when alleged experts testify, is not well defined, and while the case as a whole probably justified the court's ruling, that it was a problem for the jury, a rather broad latitude should have been allowed for cross-examination to enable the jury to judge the witness as to his fairness. While we certainly would not reverse the judgment on this ground alone, we are impressed that in the retrial the court might be more liberal, especially with respect to expert witnesses who have made it a practice over a long period of time to testify on one side only as to values.

Closely akin to the issues just discussed are Question No. 6 presented by the group appellants and Question No. 4 raised by appellant Fischer. The group appellants, particularly Port Realty Company, complain that the judge erroneously struck the testimony of their expert Brass as to the value of Port Realty's property on the ground that his valuation was based upon improper factors. Fischer contends that the court should have stricken the testimony of the Government's expert Angas for the reason that he was not qualified as an expert and took improper information into consideration.

■ Port Realty Company owned a large body of property and had spent considerable time, effort and money in the development of plans for a port city on

the peninsula. The witness Brass detailed the factors and information which in his opinion should be considered, including the existence of those plans. On cross-examination, he stated that he assumed the plans would go along with the property in the event of a free sale; and the Government moved to strike his testimony as to Port Realty's property for the reason he could not separate the value of the property from the value of the plans, which motion was granted. The judge apparently assumed that the witness had added some value for the physical drawings and charts to the value of the lands, while appellants vigorously argue that the testimony read as a whole clearly shows the witness merely considered the existence of the plans and the work done thereon to enhance the value of the *property* to a prospective buyer. We think the testimony more nearly supports appellants' view; definitely there is not sufficient certainty that the witness meant otherwise to justify the harsh penalty of striking the whole testimony from the record. Like the question raised by Register's testimony on the 1949 deed, the problem raised here was one of weight rather than competency and should have been submitted to the jury.

As shown earlier, Fischer owned a tract which had special characteristics and improvements, including a pier. The Government produced Angas as an expert to estimate the replacement cost of the pier, which he did. On cross-examination, counsel for Fischer brought out that Angas had never prepared detailed estimates of the cost of such a pier, had obtained information from persons not witnesses and, in calculating transportation costs and time, had assumed the availability of a barge line which no longer existed. A motion to strike his testimony was made but denied. We are of the opinion that this testimony comes much closer to raising an issue of competency than that of either Register or Brass. However, it must be remembered that expert witnesses are allowed much more leeway as to opinion and hearsay than are ordinary witnesses, simply because they are being questioned about their opinions and must necessarily include all factors which contribute to the opinions. We are not prepared to state the trial judge clearly erred in allowing Angas' testimony to go to the jury; but in denying the motion, he should have made it clear that only facts testified to as being within the knowledge of the witness could be considered, and not those based upon assumption alone and contradicted by other proven facts.

The group appellants also contend (Point No. 5) that the trial judge erred when he refused to permit full examination of the Government expert Hall as to his past appearances in that capacity for the Government in condemnation proceedings. Appellants were permitted to elicit from Hall his admission that he had testified for the Government in prior proceedings, but they were not allowed to question him as to the number of occasions in which Mr. Jones, Government counsel in the present case, had used him as a witness. The exception, therefore, involves the extent of cross-examination, rather than a denial of it altogether. We would not disturb the ruling if it were the only question presented by the appeal; yet, we think the appellants were entitled to have the jury know all material facts affecting the weight of testimony given by such experts for either side. If in fact Hall has spent a good part or most of his time in the employ of the Government as an expert appraisal witness, and if in fact his testimony is of such a nature that special counsel for the Government regularly uses him as a witness, it seems to us the jury was entitled to know this for the reason stated. Since his testimony consisted mainly of his expert opinion as to values, the jury had the right to consider whether this regular employment had a tendency to create a bias in favor of the Government. On the re-trial, both sides should be given rea-

sonable opportunity for cross-examination.

Group appellants' Point No. 8 and appellant Fischer's No. 2 raise the same issue: the court's refusal to permit landowners to contradict Government witnesses on alleged material facts. In each instance the judge held the evidence sought immaterial to the question of value. The effort was to show the witnesses had made statements based on unsupported assumptions as to the nature of certain transactions. In one instance a Government witness had strongly implied that a sale brought to his attention was not bona fide and did not merit consideration, and the landowner (Crowder) was attempting to give the circumstances surrounding the sale. In the other, a Government witness had gratuitously announced that Fischer's pier was in poor condition on the date of taking (see footnote 3, supra), and Fischer attempted to show the expenditures for repairs he had made prior thereto. It is possible the judge did not remember this previous testimony in view of the volume of evidence and the time which elapsed before these witnesses could be heard in their own behalf; and the situations may not arise again. However, it is well to say that where testimony is gotten before the jury, either in the presence, or absence of the owner (as was true of some of that complained of here) which may be prejudicial, the court should allow the ones so affected reasonable opportunity for rebuttal.

We find no reversible error as to the other points, especially Nos. 12 and 14 raised by the group appellants and No. 3 by appellant Fischer, and see no need to discuss them.

For the reasons. assigned, the judgments appealed from are reversed and the matter is remanded for further proceedings not inconsistent with the views expressed herein.

(It should be noted that before his death, Judge Strum felt very strongly and insisted this case should be affirmed.)

Reversed and remanded.