**UNITED STATES of America, Plaintiff-Appellant,**

v.

**499.472 ACRES OF LAND MORE OR LESS IN BRAZORIA COUNTY, TEXAS, Freeport Minerals Company, et al., Defendants-Appellees.**

**No. 81-2404.**

United States Court of Appeals, Fifth Circuit.

April 1, 1983.

Jacques B. Gelin, Anne S. Almy, Atty., U.S. Dept. of Justice, Land & Resources Div., Washington, D.C., for plaintiff-appellant.

Alfred H. Ebert, Jr., Houston, Tex., for Freeport Minerals.

Ewing Werlein, Jr., Daniel A. Hyde, H. Dixon Montague, Houston, Tex., for Dow Chemical Co. USA.

David F. Beale, Houston, Tex., for Henry R. Hamman.

Before BROWN and JOLLY, Circuit Judges, and MAHON,* District Judge.

E. GRADY JOLLY, Circuit Judge:

This case involves the valuation of condemned property. In 1977 the government acquired 500 acres of land on the Bryan Mound Salt Dome, two and one-half miles southwest of Freeport, Texas. Freeport Minerals Company owned the surface interest; Dow Chemical Company owned an underlying lease from Freeport, pursuant to which it mined salt; and Henry Hamman and others owned title to the sulphur under the condemned land.

Shortly before trial in March 1981 in the district court, a severance was granted on the motion of Freeport and Dow, who have essentially joint interest herein, whereby that portion of the case involving the sulphur interests would be tried separately from that involving Dow and Freeport. The government proceeded against Freeport and Dow, and after a seventeen-day jury trial, the jury returned an award of $22.5 million. Shortly after judgment was entered the government paid the balance due.

On appeal, the government contends that the lower court erred in granting the Motion to Sever. Specifically, the government argues that the court abused its discretion in that the bifurcated trials may produce duplicative awards in excess of the actual value of the property.

For the reasons set forth in this opinion, we cannot find that the district court abused its discretion, and we therefore affirm.

I.

The land in issue had been owned by Freeport at least since 1912, when it began sulphur mining operations. This mining continued until 1935 when it was discontinued as unprofitable. American Sulphur Company purchased mining rights, which it leased to Monsanto Chemical Company.

---

* District Judge for the Northern District of Texas, sitting by designation.

Between 1951 and 1953, Monsanto drilled seventeen sulphur recovery wells before abandoning the project. In 1967, Hooker Chemical Corporation obtained rights from American Sulphur and tried its hand, drilling forty sulphur recovery wells. The results were unsatisfactory, as in previous attempts, and the effort was abandoned.

At some point thereafter, American Sulphur went out of business. As shareholders in American Sulphur, Hamman and his family obtained 62.5 percent undivided interest in the sulphur title when American Sulphur dissolved. The remaining 37.5 percent of the sulphur interests is held among a number of other people.

Pursuant to a lease agreement with Freeport, Dow had been conducting salt mining operations since the 1940's. The mining was by a "brining" process, which involves injection of heated water into the underground salt dome. The recovered salt was used as feed stock in nearby Dow chemical plants. By 1977 the brining had created an underground storage capacity in four caverns sufficient to hold in excess of 57 million barrels of liquid hydrocarbons (LPG). Dow was using a nearby underground salt cavity, also emptied by brining, for LPG storage, and Dow and Freeport had discussed LPG storage in the Bryan Mound.

These discussions halted, of course, when the government announced its intention to take the property as a storage site for petroleum under the Strategic Petroleum Reserve program. The taking occurred on April 27, 1977. The government subsequently paid into the Registry of the Court $13,165,670, pursuant to an appraisal report which indicated that the highest and best use of the property was salt brining with gradual conversion to LPG storage.[1] When the government filed suit, Freeport and Dow were the only parties named as owners of the land in question and they were given

access to 99.5 percent of the deposit. On October 21, 1977, the government moved to add the Hammans and some sixteen other parties, or their heirs, owning mineral rights as additional defendants. Except for three parties who were listed as residing in Texas, no address was provided. The government assured the court that it was continuing the search for the whereabouts of all the parties listed and that personal service would be made on as many of them as possible. Failing personal service, service by publication pursuant to Fed.R.Civ.P. 71A(d)(3)(ii) was promised.

During the four years between the taking and the trial, Freeport, Dow, and the government prepared diligently for trial. Extensive discovery was taken. Numerous interrogatories were served and answered. Fifteen depositions were taken. Stipulations were agreed to, and Dow, Freeport, and the government arrived at a $2,128,200 settlement as to offsite damages. Additionally, the government entered a stipulation with Dow and Freeport stating that any sulphur on the property contributed no value.

After three trial postponements and after being on the docket for three months, trial was set for March 16, 1981. On February 9, 1981, the Hammans moved to amend their answer on the grounds that they should be compensated for damages to their sulphur interests outside the 500-acre tract. Also on February 9, 1981, alleging that no personal service had been had on any of the sulphur-interest owners, including themselves, and alleging that the taking of property outside the 500-acre tract was arbitrary and capricious and damaging to their interests, the Hammans moved to vacate the Order of Possession which had granted the government authority to take the property almost four years before.

[1] Subsequently, the government revised its opinion and adopted the position that the highest and best use of the property was for brining underground and for industrial and agricultural development for the surface. At trial, the government estimated a value of $2,064,000.

Freeport and Dow, contending a highest and best use of brining with conversion to LPG storage, estimated the property's value at between $21,757,000 and $27,641,000. As stated, the jury returned an award of $22,500,000.

In response to these motions, Dow and Freeport stated their concern that yet another delay might result. Both asked that the court consider severing the case and holding separate trials.

On March 5, 1981, at the pretrial conference, numerous problems became apparent insofar as the Hammans were concerned. In addition to the Hammans' stated intention to pursue their effort to recover for damages outside the 500-acre tract, serious questions arose concerning the true extent of their ownership of sulphur rights. Also, the Hammans informed the government that they, the Hammans, still had not received their appraisal reports and therefore could not exchange such reports with the government and the other parties. Additionally, the Hammans had yet to produce for depositions their three claimed experts. Finally, because of the Hammans' inability to participate in discovery, the government refused to reveal its report or to produce its expert regarding the sulphur valuation.

In response to these impediments to a trial scheduled ten days later, the court denied the Hammans' motions to amend and to vacate the Order of Possession and considered the motion by Dow and by Freeport to sever under Fed.R.Civ.P. 42(b). The government's attorney objected to severance, arguing that separate trials "would expose [the government] to the possibility of double liability if [the jury] bought the Hammans' highest and best use which I don't know. I am operating in a vacuum. I have no reports." The government's attorney stated that the Hammans' use of the property—sulphur mining by injection of super-heated water—could be incompatible with Dow's brining process, and that while separate trials were "appealing," he had to oppose the motion to sever the defendants' trials.

Freeport's counsel suggested that, in view of the serious obstacles which the recently-raised Hamman problems presented to trial as scheduled, the judge sever the cases, order the Hammans to provide the sulphur reports and depositions before trial, and allow the government to move for re-consolidation if such were deemed necessary to protect the government's interests.

The judge found merit in this suggestion and an order for separate trial of the Hammans' interests was entered subsequently on March 12, 1981.

The Hammans' sulphur report was provided to the government on March 11. The government did not take any depositions of the Hammans' experts or move either to reconsolidate or to continue the March 16 trial date for Dow and Freeport prior to that trial.

The Dow-Freeport trial began on March 16, 1981. Dow and Freeport presented their evidence over an eleven-day period. The government presented its case over a six-day period.

Despite the stipulation that the sulphur present in the tract added no value to the property, Dow and Freeport chose as a matter of trial strategy to present a great deal of evidence to show that salt brining and LPG storage were not incompatible with sulphur recovery. Essentially, they showed that the salt mining occurred far below the surface within the salt columns. In contrast, sulphur mining occurs in the "caprock," near the surface, far removed from the areas of salt recovery. Sulphur mining was also shown to be separate from the areas which would be used for LPG storage. Dow and Freeport produced evidence showing that sulphur and salt mining operations had been conducted concurrently when Monsanto and Hooker had owned the sulphur interests, that the process of injecting LPG for storage was essentially the same as injection of water for brining, and that the uses were therefore not incompatible.

Perhaps because of the stipulation, the government chose not to produce evidence to refute the showing of compatible uses. In fact, the government's principal salt dome expert supported Dow's and Freeport's contentions that salt and sulphur mining (and LPG storage) were compatible. The government expert testified that he was, in fact, involved in such a joint sulphur-LPG storage venture in a nearby dome.

At the close of the parties' case, standard jury instructions were given. The government did not request any instructions concerning possible incompatibility between Dow's and Freeport's use of the property and the Hammans' use.

The jury returned an award of $22,500,-000 and within one week the government satisfied the award in full.

## II.

The government argues that, in view of the Hammans' claim that the sulphur interests are worth $10,000,000, it faces the possibility of duplicative awards from different juries as a result of the trial court's severance of the Hammans' case from that of Dow and Freeport. Citing authority in support of the "unitary rule," that is, valuation of condemned property as a single, integrated whole, rather than according to its separate components, the government urges that the court abused its discretion in granting the severance.

## III.

■ As the Supreme Court stated a few years ago in *Bauman v. Ross,* 167 U.S. 548, 570, 17 S.Ct. 966, 975, 42 L.Ed. 270 (1897), the theory of "just compensation" under the Fifth Amendment is that such compensation is to be "just" both to the owner of the property and to the public which pays the bill. As we stated in *United States v. 320 Acres of Land,* 605 F.2d 762, 781–83 (5th Cir.1979), the government should not have to pay more for the property than would a private purchaser simply because the government is exercising its condemnation power in the public's behalf. The government is to be equated to a private purchaser buying the property in question for its highest and best nongovernmental use in the open market.[2]

Consistent with this theory, that the government should not have to pay more for the property than it is worth, the courts, including this one, have generally favored

application of the "unit rule." This rule stands for the proposition that

> if the condemned land contains a mineral deposit, ... it is proper to consider this fact in determining the market value of the land as a whole, but it is not permissible to determine separately the value of the mineral deposit and add this to the value of the land as a unit.

*United States v. 158.76 Acres of Land,* 298 F.2d 559, 561 (2d Cir.1962). In *United States v. 8.41 Acres of Land,* 680 F.2d 388, 395 (5th Cir.1982), we recently held that

> The district court must value the property as a whole rather than as the sum of the various uses to which it has been placed. *United States v. Certain Parcels of Land,* 149 F.2d 81, 82 (5th Cir.1945). The value of the separate interests cannot exceed the worth of the whole.

*See also Eagle Lake Improvement Co. v. United States,* 160 F.2d 182 (5th Cir.), *cert. denied,* 332 U.S. 762, 68 S.Ct. 64, 92 L.Ed. 347 (1947).

■ We certainly adhere to the unit theory of valuation in condemnation cases, and we see no reason why, under rare and compelling circumstances, separate trials to different juries must necessarily violate that rule. It is true that, as a general rule to be followed in all but exceptional circumstances, the evidence should be presented to a single jury. But surely, where required by the special circumstances of the case, different juries can be apprised of the various interests comprising a single tract of land, and, viewing that tract as a whole, render sound, justifiable awards. As was stated in *Georgia-Pacific Corp. v. United States,* 640 F.2d 328, 336 (Ct.Cl.1980), the notion of "just compensation" cannot be reduced to a formula or confined to inexorable rules. Latitude and discretion are available to the district court judge.

■ We review the lower court's action in granting separate trials under Fed.R.

---

**2.** For the proposition that equity is to be done to the government as well as the landowner, *see United States v. 101.88 Acres of Land,* 616 F.2d 762, 772 (5th Cir.1980).

Civ.P. 42(b)[3] in light of this discretion, *see Shumate & Co., Inc. v. National Ass'n of Securities Dealers,* 509 F.2d 147, 155 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975), and we can reverse the court's severance of trials only if we find that it abused its discretion.

■ Numerous factors justified the court's decision to sever the government's case with the Hammans from that with Dow and Freeport. As indicated above, the government had almost completely disre-garded the sulphur interest involved in the case. In addition to the serious question of service of process,[4] the failure of which, vis-a-vis the sulphur owners in addition to the Hammans,[5] would have required a new trial with the possibility of duplicative awards,[6] there was the government's seemingly impenetrable slumber as to discovery or other preparation for trial with respect to the sulphur interests. Not only was the government apparently willing to engage in a stand-off with the Hammans about ex-

---

3. "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, *may* order a separate trial of *any* claim .... (Emphasis added.)

4. The government concedes its failure to serve process upon any of the sulphur owners. Process was not served even upon the Hammans who appeared without service.

   Unlike other civil proceedings, under Fed.R. Civ.P. 4, where, upon filing of the complaint the court clerk issues a summons and delivers it to the marshal or to a person specially designated to serve the summons, the plaintiff in a condemnation action under Fed.R.Civ.P. 71A(d)(i), delivers notices with defendants' names and addresses to the clerk at the time of filing of the complaint. "Additional notices directed to defendants subsequently added shall be so delivered." Service is then made as under Rule 4(c) and (d) upon parties whose residence is known. As under Rule 4, return of service is noted in the record. Although the marshal's return of service was recorded for Dow and Freeport, no such return was recorded for any of the sulphur owners.

   Service by publication is provided for under Rule 71A(d)(3)(ii) but is sufficient only upon property owners outside the United States or upon those whose residence cannot be determined "after diligent inquiry within the state in which the complaint is filed ...." *See Walker v. City of Hutchinson,* 352 U.S. 112, 116, 77 S.Ct. 200, 202, 1 L.Ed.2d 178 (1956) (where landowner resides in state and name and address are known, publication does not satisfy due process). No proof of publication is contained in the record.

5. As stated, the owners of the remaining 37.5 percent sulphur interest were neither served nor did they make any appearance. Of the sixteen owners in addition to the Hammans listed in the motion to add defendants, a Texas address was provided for three. Even if service by publication had been made, it would not have been effective against these defendants. The failure of service was explained by the government at oral argument to be the result "of some mix-up in the office up there." Whose office, the government's attorney did not say.

6. All persons having any interest in the property should be made parties defendant in a condemnation action. Whether their claims are legal or equitable, they are entitled to be heard and, if their claims are sustained, to share in the proceeds. But since the proceeding is in rem, there are no indispensable parties; the failure to join a party does not defeat the condemnator's title to the land, though the party will retain his right to compensation. The government may have to pay a double award .... 12 Wright & Miller, Federal Practice and Procedure § 3045 at 192–03 (1973).

   Additional awards arising from failure to add proper defendants can be given either in inverse condemnation actions in the Court of Claims, *United States v. 88.28 Acres of Land,* 608 F.2d 708, 715–16 (7th Cir.1979); *United States v. 22,680 Acres of Land,* 438 F.2d 75, 77–78 (5th Cir.1971), or in actions to quiet title under the theory of possession of an equitable lien, *Fulcher v. United States,* 632 F.2d 278, 284 (4th Cir.1980) (en banc); *United States v. 88.28 Acres of Land,* 608 F.2d at 716 ("[W]e are reluctant to disturb on appeal what has been accomplished in the trial court. If it develops that the government must pay twice in order to secure the land, that is a result which it itself invited.").

   Dow and Freeport argue that because the unserved sulphur interests would have to have been given their day in court anyway, the grant of separate trials was harmless error, assuming it was error at all. The fact that subsequent trials for some of the sulphur interests would have been necessary anyway, does not, however, render moot the complete separation of trials. Appearance by even one of the owners would have allowed a full presentation to the jury of the possibly adverse claims of the sulphur interests. Although the putative error may not have been harmless, however, neither was it necessarily fatal.

change of sulphur reports or deposition of expert witnesses, the government subsequently failed to seize the opportunity given it by the court to move for reconsolidation or continuance when it was given the Hammans' reports.[7] No depositions were taken, and no reconsolidation or continuance was sought.

In addition to its failure to act in timely fashion with regard to the Hammans, the government fell woefully short during trial of making any case that brining or LPG storage was inconsistent or incompatible with sulphur recovery. The government takes the position that it could not "make the Hammans' case for them." The showing of incompatibility was most certainly the government's case to make and not the Hammans' if it wished to protect itself against duplicative awards.

The government's complaint of prejudice because of the possibility of duplicative awards as a result of the court's exercise of discretion in granting separate trials is not as persuasive as it might have been. Had the government taken steps to act in a timely fashion before and at trial to show incompatible use or otherwise to have reduced the risks of such duplicative awards, the claimed fears of possible excessive awards no doubt would have more impact.

Added to its refusal or inability to refute the strong showing by Dow and Freeport of compatibility of brining/LPG storage and sulphur recovery, we note that the government stipulated with Dow and Freeport that the sulphur present in the tract contributed no value to it. While this does not preclude a subsequent jury award to the sulphur interests, and is therefore characterized as "irrelevant" by the government, it does indicate strongly that the government considered the issue of the sulphur interests to be moot. This reading is made doubly plausible when the stipulation is considered in consonance with the other actions (or inactions) by the government insofar as the sulphur interests were concerned.

Finally, we note that the government stipulated to standard jury instructions concerning Dow's and Freeport's interest, with no request for a special instruction concerning the Hammans, et al. This failure does not merely constitute the government's sleeping on its rights, but, in the light of the government's present contentions of prejudice, borders on hibernation.

## IV.

Severance of interests in a condemnation proceeding is unusual. It is not, however, unprecedented. In *United States v. 1071.08 Acres of Land,* 564 F.2d 1350 (9th Cir.1977), one of the owners of the mineral interests under the condemned property moved for a separate trial under Rule 42(b) after the government had repeatedly failed to produce its experts' reports, waiting until twenty days before trial to do so. The party moving for separate trials argued that twenty days was insufficient time to study and refute the government's evidence. The district court granted the Rule 42(b) motion.

Separate trials were held, with the government objecting at both to the separation, arguing that duplicate awards were possible. The jury returned an award of $454,000 in the first trial for the surface interests, and another jury in the second trial returned an award of $439,756.50 for the mineral interests. At neither trial did the government present any evidence of the effect of one party's interest on the value of the other, nor did the government produce evidence or request instructions on the inconsistent uses of the property.

The Ninth Circuit upheld the granting of separate trials. Noting that the review of the grant of separate trials was limited to abuse of discretion, the court conceded the "superficial appeal" of the government's argument regarding the possibility of duplicative awards. 564 F.2d at 1353.

However, it is not clear to us that mining of a portion of 193.9 acres on a 1,064.98 acre ranch so completely conflicts with

---

**7.** The sulphur reports were delivered to the government on March 11. Trial started on March 16 and lasted seventeen trial days over a three-and-one-half-week period.

cattle ranching or raises significant risk of duplicative awards. What risk there was could have been eliminated by the introduction of evidence of inconsistent uses at each of the trials. The government had ample opportunity to present such evidence and it neglected to do so.

Aside from the district court's articulated ground for the order [divergent interests would confuse the jury], the government's procrastination in providing Lewis with its geological reports on the mineral interests may have so raised the specter of prejudice to Lewis' right to present his case on their value as to independently justify separate trials.

564 F.2d at 1353.

The court in *1071.08 Acres* went on to discuss with approval an opinion from this court in *Gwathmey v. United States,* 215 F.2d 148 (5th Cir.1954). *Gwathmey* involved condemnation of 933 tracts of land, with 236 verdicts returned by one jury. On appeal the court held that the lower court had erred in not granting separate trials. The court stated as a general principle that:

> Because of the complex and variable nature of such factors [contributing to the condemned land's value] in modern conditions, the law very wisely allows the trial judge a broad discretion as to methods which shall be used in accomplishing the best results. . . .

215 F.2d at 153. Further in the opinion, the court stated:

> Our opinion should not be interpreted to require a district court to accept or adopt any particular method for the trial of condemnation suits, or to mean that this court will substitute as judgment in any case wherein similar questions arise . . . . Like all such cases [the question of separate trials] is a question for the trial judge, whose discretion will be disturbed only when we are convinced there has been a clear abuse.

215 F.2d at 157–58.

## V.

We cannot find that the district court abused its discretion by granting Dow's and Freeport's motion to sever the cases. They had been engaged in lengthy, costly preparation for trial. After three previous settings for trial, it was scheduled, three months in advance, for March 16. At pretrial on March 5, as a result, in part, of the government's failure to prepare for a significant portion of the case, *i.e.,* the sulphur interests, that trial date was placed in jeopardy and the entire posture of the case threatened.

At trial, after the government had received the Hammans' analyses, with ample time to digest them, no apparent use was made of them and no move to reconsolidate or to continue the case was made. Similarly, the government produced no evidence at trial of inconsistent uses, nor did it request any jury instructions aimed at the danger of which it now complains.

We recognize that such an eleventh-hour receipt of information would have required an around-the-clock effort, and perhaps additional attorneys to prepare for trial. The inconvenience imposed on the government would have been more than justified, however, in view of its inadequate preparation to that point in readying for that portion of trial involving the sulphur interest.

We reiterate that we do not here sanction any departure from valuation of condemned property as a unit. The fact that a different jury will be evaluating the worth of the sulphur interests at a subsequent trial does not preclude evidence of the use of the property for brining/LPG storage. The fact that the jury at the instant trial did not receive all of the evidence that it might have concerning the sulphur interests is, in large part, the government's fault.

In conclusion, we wish to emphasize the limited nature of our holding today. We do not detract from the importance of presenting in a single trial to a single jury all interests of all parties in the condemned property. We emphasize the importance of a single trial in preserving the unitary rule. Our holding here simply acknowledges that there are rare circumstances where separate trials are justified. Our holding further acknowledges that such determinations

are within the discretion of the trial court. That discretion was not abused here.

The lower court's granting of separate trials is therefore upheld, and, there being no other point of error, the award rendered shall stand.

AFFIRMED.