Per Curiam::
This case was referred to Trial Commissioner Eoald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Eule 57(a). The Commissioner has done so in an opinion and report filed on May 16,1968. On June 24, 1968 defendant filed a motion to adopt the findings, opinion and conclusion of the Trial Commissioner and on July 8, 1968 plaintiffs moved that the court adopt and print the findings of fact, opinion and conclusion of law made by the Trial Commissioner as the findings, opinion and conclusion of the court. Since the court agrees with the Commissioner’s opinion, findings and recommended conclusion of law, as hereinafter set forth, it grants the motions of the parties and hereby adopts the same as the basis for its judgment in this case without oral argument. Plaintiffs are, therefore, entitled to recover and judgment is entered for plaintiffs with the amount of recovery to be determined pursuant to Eule 47(c).
OPINION OE COMMISSIONER
Hogenson, Commissioner:
In this federal income tax case, plaintiffs sue to recover the sum of $5,544.29, plus interest from the date of payment as provided by law, paid by them on or about June 21, 1965, as a result of a tax deficiency assessed by the Internal Eevenue Service on their 1962 return.
The only issue is the amount of the deduction allowable pursuant to section 165(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 165(a) (1958), as a loss for damage done to plaintiffs’ residential property by a windstorm on October 12,1962. Not in dispute is the proper method of valuation of the loss, hereinafter set forth as a conclusion of law.
After a full review of the record and upon consideration of the requested findings of fact and briefs of the parties, it is my opinion based upon the following detailed and ultimate findings of fact and conclusions of law, that plaintiffs sustained a casualty loss (not compensated for by insurance) in the sum of $600 on October 12,1962, that such amount was deductible in their 1962 federal income tax return, and that to the extent to which they have overpaid *593 their federal income tax by not being allowed a deduction in that amount, plaintiffs are entitled to recover, with the amount of recovery to be determined in further proceedings pursuant to Eule 47(c).
FINDINGS oe Fact
1. Plaintiffs are husband and wife. The principal office and place of business of the husband is 1919 N.W. Kearney Street, Portland, Oregon, and plaintiffs reside at 10965 S.W. Walker Eoad, Beaverton, Oregon.
2. Plaintiffs duly filed with the District Director of Internal Eevenue at Portland, Oregon, an income tax return (Form 1040) for the year ended December 31, 1962, which return showed an overpayment of tax in the amount of $6,943.29 which was credited to plaintiffs’ 1963 estimated tax.
3. In their tax return plaintiffs claimed a $31,000 casualty loss ($33,000 loss minus $2,000 insurance recovery) for damage done to their residential property by a windstorm on October 12,1962.
4. Thereafter, on or about March 22, 1965, the District Director of Internal Eevenue audited the return and issued to plaintiffs a notice of deficiency in the amount of $5,544.29 for the year ending December 31, 1962. On or about June 21, 1965, plaintiffs paid such deficiency, together with interest accrued to the date of payment.
5. On or about June 23, 1965, plaintiffs filed with the District Director of Internal Eevenue at Portland, Oregon, a claim for refund (Form 843) for the year ending December 31,1962, in the amount of $5,544.29.
6. A statutory notice of disallowance of the claim for refund was issued to plaintiffs by the Internal Eevenue Service on April 18,1966. The petition in this case was filed on May 10,1966.
7. In 1956 plaintiffs purchased for $13,000, 4.45 acres of heavily wooded unimproved land in Beaverton, Oregon. The lot is rectangular in shape and is 290 feet in width and 675.1 feet in depth. A timber cruise, made shortly after plaintiffs’ *594 purchase of the property, reflected that there were 200,000 feet of timber on the land. This cruise did not take into consideration small trees or deciduous trees.
8. The property is located on the side of a knoll approximately 9 miles west of downtown Portland, Oregon. The lowest point of the property is in the southwest corner, and it slopes upward to an elevation of 20 to 25 feet to the northeast comer and the east line.
9. Subsequent to the purchase of the land in 1956, plaintiffs built in 1960 a split-level house of conventional design on the central portion of the property. The house was located approximately 500 feet from Walker Eoad and was reached by a private driveway.
The dwelling was frame with approximately 2,776 square feet of living area, not including basement. Adding a finished recreation room in the basement and an adjoining game room, the living area totaled 4,000 square feet. It had four bedrooms, two and one-half baths, three fireplaces, finished daylight basement, forced air oil heat, drywall interior construction, with parquet and other hardwood flooring, complete concrete foundation, porches and sundeck. A two-car carport was located beneath the sundeck area.
10. On October 12,19.62, a windstorm struck the Portland, Oregon, area and damaged trees growing on plaintiffs’ residential property. The residence was not damaged to any extent.
11. The trees damaged by the storm were natural growth. They were not planted on the property by the plaintiffs, nor were they rare or ornamental trees and shrubs. By actual count, 89 mature trees were damaged, and of these, about one-half were either uprooted or broken off at or near the base. There were approximately 500 mature trees on the land prior to the windstorm.
12. Immediately after the windstorm the property was still heavily wooded, although not as densely as before. The greater part of the trees which had been uprooted or damaged by- the windstorm had not been removed prior to the date of the trial in 1967. The plaintiffs did not retain others to clear or clean up the damage.
*595 13. Plaintiff, Paul R. Chichester, testified that immediately before the storm the property had a fair market value of $81,500, and that immediately after the storm the property had a fair market value of $67,000. Mr. Chichester, a manufacturer’s representative, is not a real estate expert and has been involved in only four real estate transactions during his lifetime, all residential properties. When he prepared his 1962 federal income tax return, he then valued the property at $108,000 prior to the storm damage and claimed a loss (or decrease in value) of $33,000. He changed his opinion within 6 months prior to the trial of this case.
Mr. Chichester’s opinion of $81,500 fair market value before the windstorm is based on his estimate of the amount plaintiffs had invested in the property.
Mr. Chichester’s opinion of after-windstorm fair market value of $67,000 was arrived at by taking the sum of $79,500, the price at which he had the property listed for sale in 1967, adding $3,000 as the cost of cleanup of the storm debris, and subtracting $14,000 as the amount by which he considered the land to have appreciated in value from the 1962 storm to the trial date in 1967, and also subtracting an additional $1,500 for the labor he had performed in removing some of the debris.
14. Plaintiffs and defendant engaged real estate appraisers who testified as to the value of the subject property before and after the storm damage on October 12,1962. Both of them had had considerable experience in the real estate market of Portland and surrounding areas, and particularly in the area of subject property, antedating as well as following October 12, 1962, and both of them were acquainted with the environs of such property. It is clear from consideration of all of the testimony of each of them that each considered fair market value to be the price at which property would change hands between a willing buyer and willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.
15. The evaluation of the subject property by plaintiffs’ appraiser, Mr. Paul B. Lusk, is summarized as follows:
(a) The opinion of plaintiffs’ appraiser was that the fair market value of the property before the windstorm was *596 $70,000, and that the fair market value of such property immediately after the windstorm was $63,000, or a decrease in value of $7,000.
(b) Mr. Lusk had been engaged in real estate sales and appraisals for almost 22 years, principally in the Portland area, but throughout Oregon and in parts of Washington. Most of his fee appraisals had been done in the past 15 years, and he had qualified and testified as a real estate appraiser in various Oregon and some Washington state and county courts, although not in a federal district court. His primary court experience was in condemnation cases, in which he had testified for condemnors and condemnees, but in the past 4 or 5 years, he had appeared almost exclusively for individuals rather than a govermnental body due to the fact that he had requested removal of his name from the state list of qualified appraisers.
In addition to doing appraisals for various private clients and some political subdivisions, Mr. Lusk had done several hundred appraisals of residential properties for the Federal Plousing Administration, four of them in 1966. He had resided in the Beaverton area for 20 years, about 2 miles from the subject property, and had handled a substantial number of sales of real estate in that area.
(c) Mr. Lusk’s academic qualifications consisted of study and analysis of various reference books on real estate evaluation, attendance at various seminars, and private tutorship by his late partner in the real estate business. He had been a licensed real estate broker since June of 1955. Mr. Lusk is not a member of the American Institute of Real Estate Appraisers. He took Appraisal Course I of that Institute, but failed the examination, and he offers the explanation that he was ill and exhausted at the time. He has not taken Appraisal Course II of the Institute. He was formerly a member of the Society of Real Estate Appraisers, but withdrew his membership and application for designation as a Senior Appraiser because of a difference of opinion with some of the members. He is a member of the Associated Appraising Association and the American Right-of-Way Association.
(d) The trial of this case was held on Monday, August 7, 1967. Mr. Lusk was retained by plaintiffs and first inspected *597 tlie subject property on the preceding Thursday, August 3, 1967. He spent about 2 hours during which he examined the exterior of the house and walked the land from north to south and east to west. He returned to the property at noon on Friday, August 4, and made a detailed inspection of both the interior and exterior of the house, and then proceeded to the county courthouse where he obtained a photostat of a plat of the property and the figures concerning its assessed valuations and tax assessments. He then consulted information records of the Pioneer National Title Insurance Company as to the sale of some lands in the general area. He viewed photographs of the subject premises taken by plaintiffs shortly after the windstorm.
(e) Mr. Lusk did not prepare a written appraisal report. He used the market data approach, or comparable sales approach, in formulating his opinion as to the value of the subject land, and the reproduction cost estimate approach as to the improvements.
(f) On the reproduction cost of the house, Mr. Lusk applied a factor of $12 per square foot to the living area of 4,000 square feet, and concluded that such cost was $48,000. To arrive at the $12 factor, he took $6-per-square-foot as the basic factor, covering excavation and foundations and some framing, and then he added additional factors for such items as hardwood floors, wall-to-wall carpets, interior finish, plasterboard or sheet rock, heating, finished roof, window sash, and other features of the house, not covered by the $6 figure. Although pressed by defendant’s attorney on cross-examination, Mr. Lusk was unable to itemize what allowances he made for what features, explaining that he had made his computations on scratch pads which he had destroyed.
(g) On his land evaluation, Mr. Lusk did not rely upon specific comparable sales, explaining that the county courthouses were closed on Saturday and Sunday, and he had no opportunity to check. He relied on his general knowledge of land sales in the vicinity, and then “sat back in my chair” and thought of sales of properties, with whjich he was familiar, which were not comparable but similar to the subject property. He placed a valuation on the land before the storm of $5,000 per acre, but he did not testify as to what value *598 be placed on the land after the storm, but did explain that his $7,000 figure of difference in value, before and after the storm, took into consideration “cost of cure,” i.e., removal of the storm debris and planting of fast-growing trees to enhance the desirability of the property to a prospective purchaser. He conceded that he was not qualified to estimate such costs, but stated that it was his opinion that such cost of cure would have amounted to $7,000.
16. The evaluation of the subject property by defendant’s appraiser, Mr. Ken Evans, is summarized as follows:
(a) The opinion of defendant’s appraiser was that the fair market value of the property before the windstorm was $58,500, and that the fair market value of such property immediately after the windstorm was $55,900, or a decrease in value of $2,600.
(b) Mr. Evans is a realtor primarily engaged in real estate appraising, having made appraisals for about 12 years, and having lived in Portland, Oregon, for 22 years. He had successfully completed the examination and demonstration appraisal required for membership in the Society of Eeal Estate Appraisers and received the designation of Senior Eesidential Appraiser. Pie is a member of the Oregon Association of Eealtors, serving as its president in 1966. He successfully completed Appraisal Course I and Appraisal Course II given by the American Institute of Eeal Estate Appraisers.
(c) Mr. Evans specializes in the appraisal of residential property in the Portland, Oregon, area. He has qualified as an expert real estate appraiser in the circuit court of Oregon and in the federal district court of Oregon. His appraisal clients have been individuals, corporations, the state highway department, and the Federal Housing Administration. His appraisals average about 150 per year. In every case he prepares a written report. He did so in this case, and such report is in evidence. He did between 50 and 60 appraisals of property as a result of the 1962 windstorm.
(d) Mr. Evans’ first step in the appraisal was to check the records at the Washington County Courthouse and the Pioneer National Title Insurance Company to gather specific *599 data on the subject property. He then spent between 2 and 3 hours inspecting the interior and exterior of the house and the subject land. The inspection included measuring the house and photographing the property. The measurements taken by him coincided with the measurements obtained from the county records. He concluded that there were about 2,776 square feet of living area in the house, not including the basement areas.
(e) In order to arrive at the fair market value of the entire property before the windstorm, Mr. Evans reviewed the sales of a number of properties and determined that three of them were comparable to subject property. He checked each sale with either a party thereto or the realtor involved to make certain that it was a true market sale. The three sales are as follows:
Sale No. 1 occurred in July of 1962, and was property located at 2150 S.W. Mayfield, about one-half mile from the subject property. The land was 1.87 acres. The house was one story, built in 1955, with a floor area of 2,415 square feet, no basement, two-car garage, living room, dining room, kitchen, three bedrooms, three baths, similar quality interior to subject, and one interior fireplace. It had an exterior swimming pool and covered patio. Mr. Evans concluded that overall comparison indicated that the subject property was slightly better in value, considering the variances in the dwelling and the extra value of subject land, and this sale indicated a price for subject property of $60,000.
Sale No. 2 occurred in June of 1963, and was property located at 11375 S.W. Walker Koad, west of subject property. On 2.25 acres of land, partially wooded, fronting on Walker Eoad, the dwelling was one story, slightly older than the subject, built in 1959, with 3,219 square feet of floor area, no basement, with living room, dining room, family room, kitchen, three baths and three bedrooms. It had a large complete garage with 648 square feet, and the exterior of the house had a considerable amount of stone trim. The house had radiant electric heat in the ceiling and two fireplaces. There was an exterior patio. Mr. Evans concluded that this sale indicated a value for subject property of $58,500.
*600 Sale No. 3 occurred in November of 1962, and was property-located at the northwest comer of Mayfield and Walker Boad, to the west of subject property. This dwelling was known as “Mr. Blanding’s Dream House” in that it was a duplicate of the one described and built by the author of that book approximately 20 years ago. The land was 1.84 acres, partially wooded, with a rather extensive lawned and landscaped setting around the dwelling and garage. The dwelling was two stories, with a full basement, and outdoor swimming pool with dressing rooms. There was an oversized two-car garage with servants’ quarters above. The dwelling had approximately 1,578 square feet on the first floor. It had a living room, dining room, kitchen, nook, four bedrooms, Sy2 baths, powder room and hall. The exterior was brick veneer with aluminum shingle roof. It was heated with hot water radiant heat with coils in the walls. It had one triple fireplace. This property sold for $60,000, and Mr. Evans concluded that the indicated value of subject property was $57,500.
After comparison of each of the foregoing properties to the subject, and taking into account necessary adjustments for differences, Mr. Evans concluded that the value of subject property prior to the windstorm was $58,500.
(f) Since the improvements on subject property had not been damaged by the windstorm, Mr. Evans concluded that it was necessary to value the subject land before and after the windstorm to determine the effect on the property as a whole. First he appraised the value of the subject land by making comparisons to five sales of unimproved land, all located within 1 mile of subject land. These sales occurred in the approximate time just before the windstorm, and covered tracts varying in size from 0.85 to 2.46 acres. Three of these tracts were wooded, although not as heavily as was subject land. The sales prices ranged from $3,750 to $5,880 per acre. Mr. Evans concluded that the dissimilarities requiring adjustment of the respective sale prices to the valuation of the subject land were size of each tract, suitability of terrain, and quality of tree cover, all as compared to subject land. After making such adjustments, he concluded that *601 the fair market value of subject land (unimproved) immediately prior to tbe windstorm was $5,500 per acre, or a total of $24,000.
(g) Deducting this $24,000 valuation of subject land from his total property valuation of $58,500 prior to the windstorm, he estimated the value of the subject improvements as of October 12,1962, at $34,500.
(h) In order to determine what effect the windstorm had on the value of the subject property, Mr. Evans considered two factors: (1) The cost of removal of the debris, and (2) the effect on the remainder for the loss in density of the wooded area and the loss of beneficial effect provided by the deciduous trees in lesser quantity.
(i) On the cost of removal of debris, Mr. Evans considered the condition of the subject property immediately following the windstorm, without anything having been done to clear it, and he consulted the Ahrens Construction Company which did work of that type and had equipment and manpower capable of removing logs and debris. After viewing the photographs, maps, and descriptive data, and after inspecting the property, this contractor advised Mr. Evans that its highest price for completely cleaning up the property would have been $1,500. Mr. Evans relied upon this estimate for a cleanup cost of the subject property.
(j) Mr. Evans then compared the subject land to the three wooded tracts, of the five sales mentioned above in sub-paragraph (f) of this finding, and after relating the subject land in its damaged condition to those three sales, he concluded that the loss in value of subject land from the downed trees was $250 per acre, for a rounded total of $1,100.
(k) In summary, Mr. Evans concluded that the subject land value before the storm was $24,000, and with the cleanup cost of $1,500 added to the $1,100 loss in value from the downed trees, its after-storm value was $21,400. Since the house was not damaged, he attributed none of the loss in value to it, and considered that his $34,500 evaluation of the house remained undiminished. Accordingly, he concluded that the loss in market value of the subject property because *602 of tbe .October 12,1962, windstorm was $2,600, the difference between his before and after evaluations, $58,500 less $55,900.
17. .Plaintiffs received compensation in the amount of $2,000 from insurance for the damage to their residential property, caused by the windstorm of October 12,1962.
ULTIMATE FINDINGS AND CONCLUSIONS
18. The opinion of plaintiff, Paul E. Chichester, as to the amount of the casualty loss has no probative value. His before-storm estimate of value was based solely on the amount he believed he had invested in the property. Kinter v. United States, 156 F. 2d 5, 7 (3d Cir. 1946). His after-storm estimate of value was based on the price at which he had the property listed for sale 5 years after the casualty loss occurred. Atlantic Coast Line R.R. v. United States, 132 F. 2d 959, 963 (5th Cir. 1943). Contrary to the pertinent Treasury Eegulation, hereinafter cited, the validity of which is not in- issue, his assumed costs of repair were not shown to be reasonable, and the entire basis of his opinion was not related to. reduction of market value on account of the casualty loss.
19. The opinion of plaintiffs’ appraiser as to the reduction of market value of subject property on account of the casualty loss is rejected as not having any substantial weight, due to his late retainer by plaintiffs to make an appraisal, his lack of opportunity to make adequate and reasonable investigation and research, his failure to rely upon specific comparable sales to afford the court a basis for evaluating his opinion, his armchair approach to consideration of sales he had made or observed in the area, without revealing any details establishing comparability, his failure to investigate reasonable costs of repair, his admission that he lacked qualifications to assess the costs of repair, and his inability reasonably to define the factors involved in his reproduction cost approach.
20. The opinion of defendant’s appraiser was based upon a consideration, investigation and analysis of market con *603 ditions, which conformed to the method of valuation of casualty loss, as defined in 26 U.S.C. § 165(a) (1958) and in Treas. Reg. § 1.165-7 (a) (2), 26 C.F.E. .§ 1.165-7 (a) (2) (Rev. to 1-1-61). The proper method of valuation of casualty loss, not in dispute in this case, is the difference between the fair market value of the property immediately before and immediately after the casualty, less any part of the loss compensated by insurance, with cost of repairs acceptable as evidence of loss of value if (a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) 'the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty.
His testimony and conclusion were reasonable on the basis of his detailed investigation of the appraisal problem, as well as in the light of all of the evidence in this case, and his conclusion should be adopted by the court without modification, particularly because plaintiffs have failed to sustain their burden of proof to show that Ms evaluation of the casualty loss was less than a fair and reasonable amount.
2L The fair market value of plaintiffs’ residential property immediately prior to the windstorm on October 12,1962, was $58,500, and the fair market value immediately after such windstorm was $55,900. Therefore, the fair market value of plaintiffs’ property was reduced $2,600 by the windstorm.
22. Deducting the $2,000 received by plaintiffs from insurance as compensation for such loss, plaintiffs are entitled to a casualty loss deduction for the taxable year 1962 in the amount of $600.
CONCLUSION or Law
Based upon the foregoing findings of fact and conclusions of law, which are adopted by the court and made part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to. recover and judgment is entered to that effect, with the amount of recovery to be determined in further proceedings pursuant to Buie 47 (c).
*604 In accordance with the opinion of the court, a memorandum report of the commissioner and a stipulation of the parties, it was ordered on December 31,1968, that judgment for the plaintiffs be entered for $257.87 with interest as provided by law.