UNITED STATES of America

v.

**2,175.86 ACRES OF LAND, MORE OR LESS, SITUATE IN HARDIN AND JEFFERSON COUNTIES, TEXAS, and Kirby Forest Industries, Inc., and Unknown Owners.**

Civ. A. No. B–78–598–CA–MF–1525–54.

United States District Court,
E.D. Texas,
Beaumont Division.

May 5, 1988.

George Phair, Asst. U.S. Atty., Beaumont, for plaintiff.

Joe Roady, Sheinfeld, Maley & Kay, Houston, for defendants.

## MEMORANDUM OPINION

COBB, District Judge.

### PROCEDURAL HISTORY

This protracted condemnation case had its origins in the mid 1960s when several

studies were made on the desirability of establishing a National Park Preserve in the Big Thicket area of East Texas. Litigation involving these 2,175.86 acres commenced on August 21, 1978, when the government, after failing to acquire the subject tract by negotiated purchase filed a complaint in condemnation. The case was originally tried before the Big Thicket Condemnation Commission in March 1979. After hearing competing evidence of fair market value, the Commission entered its report awarding Kirby $2,331,202 on March 3, 1980. The district court entered judgment adopting the Commission's award on August 9, 1981. The district court also ruled that the government's filing of a complaint in condemnation on August 21, 1978, constituted a taking, and awarded interest from that date to the date the government deposited the award with the court. Both sides appealed. The court of appeals unanimously held the Commission's report to be inadequate under the guidelines set out in *United States v. Merz*, 376 U.S. 192, 198, 84 S.Ct. 639, 643, 11 L.Ed.2d 629 (1964), and remanded for further findings. *United States v. 2,175.86 Acres of Land*, 696 F.2d 351 (5th Cir.1983). By two-to-one vote, the court of appeals reversed the district court's award of interest, and held that in straight condemnation cases, date of taking is the date the government pays the condemnation award. The Supreme Court affirmed the court of appeals. *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed. 2d 1 (1984). On remand, the case was tried before the court *de novo*.

■ Before entering findings as to the fair market value of the condemned property, the court will deal with Kirby's argument that the original Commission findings awarding Kirby $2.33 million established a floor below which this court cannot enter judgment. Kirby essentially relies on three arguments in its assertion that a "floor" exists: First, the Supreme Court specifically mandated that the parties would not be "permitted to question" the original valuation; secondly, the original valuation was never vacated by either the Fifth Circuit or the Supreme Court; and lastly, the value of the land could only go up.

In Kirby's first argument, Kirby refers to the language of the Supreme Court opinion which states:

> The parties would not be permitted to question the adjudicated value of the tract as of the date of its original valuation; they would be limited to the presentation of evidence and arguments on the issue of how the market value of the property altered between that date and the date on which the judgment was paid by the Government.

467 U.S. at 18, 104 S.Ct. at 2198. Kirby, in characterizing the importance of this language, states that the Supreme Court "directed" the parties to follow this procedure.

Rather than "directing" the parties to follow an evaluation procedure, however, the Supreme Court merely mentions that this "procedural device ... *could do* (emphasis added) tolerable service in this case." *Id.* The Court refers to this method of valuation as a "procedural option." *Id.* at 19, 104 S.Ct. at 2198–99. In addition, the Court leaves open the approach to the valuation in footnote 30, when it states that:

> Either Congress or a lower court *might perceive a more easily administrable way* of ensuring that the compensation paid to the owner of condemned land does not fall substantially below the fair market value of the property on the date of the taking. (emphasis added).

*Id.* at 19, footnote 30, 104 S.Ct. at 2199, footnote 30.

This court did in fact find a more administratable way to valuate the property—the trial *de novo*. The trial *de novo* was conceived as a way to address the three-year time gap between the first hearing on March 6, 1979, and the new valuation date, based on the date of taking of March 26, 1982. In addition, the trial *de novo* was meant to insure that the inadequacies of the first valuation proceeding as stated by the Fifth Circuit would be addressed. Several pretrial conferences were held well in advance of trial, where the court ruled the

case would be tried to the court without a jury, and tried *de novo*. Thereafter, Kirby did not raise the floor argument until four days before trial in a proposed pretrial order. To this day, Kirby has not contended that the court erred in trying the case *de novo*, but Kirby has only contended that the result of the *de novo* hearing should be subject to a floor. This, the court finds, is inconsistent with the purpose of the trial *de novo* which was held to ascertain the value of the land on the date of taking.

In Kirby's second argument, it states that although the case was reversed and remanded, the original valuation was never vacated by either the Fifth Circuit or the Supreme Court. Kirby argues that this procedural posture leaves the original valuation in place. This court disagrees. There would be no point in a remand by the court of appeals or the Supreme Court if these courts simply wanted to keep $2.3 million as a bedrock value. In addition, the court of appeals specifically states that the Commission report was "inadequate." 696 F.2d at 358. This language does not allude to a desire by the court of appeals to keep the original valuation as bedrock. It seems inconceivable that the appellate court would remand a case and then bind the trial court's hands in reaching a fair valuation. The slate for valuation of this property was wiped clear by the trial *de novo* of the valuation, and the prior valuation was properly considered in the trial *de novo* for substantive purposes when the witnesses were unavailable, and for impeachment purposes.

Had this court correctly found the Report of Commissioners to be legally flawed in its July 28, 1978, memorandum opinion as the reversal by the Fifth Circuit ultimately said it should have done, this court would have had several options under FED. R.CIV.P. 53 governing "Masters," part of which FED.R.CIV.P. 71A relating to "Condemnation of the Property" incorporates by reference. Specifically, FED.R.CIV.P. 53(e)(2) provides in pertinent part as follows:

> ... The court after hearing may adopt the report or may modify it *or may reject it in whole* or in part *or may receive further evidence* or may recommit it with instructions.

FED.R.CIV.P. 53(e)(2) (emphasis added). Obviously, the options recited in the Rule give broad discretion to the court after finding a commission report clearly erroneous. Therefore, the rule should not be construed differently merely because it was the Fifth Circuit, rather than the trial court, which determined that the flaws in this commission report were fatal ones under *United States v. Merz*, 376 U.S. 192, 84 S.Ct. 639.

Kirby's last argument for the floor is based on a belief that land values could only increase over time. However, the evidence in this case is contrary, and the Supreme Court expressly recognized that the values of certain parcels of land "decline in value." 467 U.S. at 17, 104 S.Ct. at 2198. It must be kept in mind that the Supreme Court opinion establishes the time of the taking as three years subsequent to the time of the original Commission valuation. Establishing the 1979 Commission valuation as a floor for land values in 1982 makes no more sense than establishing the same survey as a ceiling for land values in 1982. The courts have admonished that the landowner "must be made whole but is not entitled to more." *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934). "Just compensation means a compensation that would be just in regard to the public, as well as in regard to the individual ..." *Bauman v. Ross*, 167 U.S. 548, 570, 17 S.Ct. 966, 975, 42 L.Ed. 270 (1897); and "just compensation ... is compensation [that] is 'just' both to [the] owner whose property is taken and to the public that must pay the bill ..." *United States v. 320 Acres of Land*, 605 F.2d 762, 781 (5th Cir.1979).

## FINDINGS OF FACT

1. This is a condemnation case in which the United States of America filed a complaint in condemnation on August 21, 1978, condemning fee simple title to tracts numbered 189–09, 189–15, 189–18, 190–02, 190–05, 191–02, and 191–05, but excluding from the taking all oil, gas, and other minerals.

The condemned tract is a partial taking of 2,173.58 acres of land, more or less, out of a 2,518.57 acre tract, leaving a 344.99 acre remainder. The condemned tract is in the Kirby, Pickle, and Spear survey of Jefferson and Hardin Counties, formerly owned by the defendant Kirby Forest Industries.

The case was originally tried before the Big Thicket Condemnation Commission in March 1979. By its Report and Findings filed March 3, 1980, the Commission awarded the defendant the sum of $2,331,202, which was adopted by the District Court in its Judgment on Commission Award entered August 9, 1981. *United States v. 2,175.86 Acres of Land,* 520 F.Supp. 75 (E.D.Tex.1981). On October 8, 1981, the government filed its Notice of Appeal of the district court's judgment to the Fifth Circuit, and the following day, the defendant filed its Notice of Appeal. On March 16, 1982, in order to secure clear title to the condemned lands pending the appeal, the government deposited in the registry of the court the sum of $2,835,508.06 pursuant to the court's judgment on the Commission award. The deposit included a disputed amount of interest ($506,306.06) at 6 percent per annum from the date of the filing of the complaint (August 21, 1978) to the date of payment. On March 30, 1982, Kirby applied and subsequently received the sum of $2,825,508.06 ($10,000.00 having been held out for payment of ad valorem taxes). The Fifth Circuit reversed and remanded the district court judgment holding that the Commission's report was "inadequate" and that in "complaint only" cases, the date of taking is the date of the depositing of the just compensation in the registry of the court. Accordingly, the court held that the defendant was thereby not entitled to interest. 696 F.2d 351. The defendant appealed the Fifth Circuit ruling to the Supreme Court which granted certiorari. At 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1, the Supreme Court affirmed in part and remanded in part.

2. In the before condition, the subject property is an irregularly shaped tract of land that lies west of the Neches River and generally east of U.S. Highways 69, 96, and 287. It is bordered on the north by the Big Thicket National Preserve, on the east by the Neches River, and on the south and west sides by adjoining landowners. It is heavily timbered with various hardwood species, cypress, and some pine in its higher elevations. Approximately 743 acres are severed from the balance of the tract by the Lower Neches Valley Authority Canal which traverses the middle of the tract from roughly the southwest to the northeast. In other words, approximately 1430 acres comprise an island bounded on the east by the Neches River, the south by Pine Island Bayou, and the northwest by the Lower Neches Valley Authority Canal. The remainder of the tract west of the L.N.V.A. Canal enjoys good access by Cook's Lake Road, a county maintained road which runs due east from U.S. Highway 69. Access to the portion of the tract on the island is by water only. The tract has about one mile of frontage on the Neches River and about five miles of frontage along Pine Island Bayou. The L.N.V.A. Canal right-of-way is a 250–foot wide right-of-way and dates back to 1928.

In addition to the heavy timber, the tract also has four natural lakes or former "ox bows" generally on the east end of the tract. Cook's Lake is accessible from Pine Island Bayou, and Scatterman Lake and the southern portion of Sandy Lake are accessible from the Neches River. There is also an unnamed lake on the southern edge of the tract which is accessible from Pine Island Bayou.

There are approximately 181.64 acres of the taking that lie south of the Pine Island Bayou and are within the corporate limits of the city of Beaumont. In addition, portions of the tract along Cook's Lake Road are serviced by Lumberton Municipal Utility District. Electrical and telephone utilities are also available to this portion.

The elevation of the subject tract is generally very low. For example, the court heard evidence that in the 2173.58 acre taking, more than 1000 acres have an elevation of 5 feet above sea level or less, approximately 1000 acres have an elevation of between 5 feet and 10 feet above sea level, and there are only 100 acres above 10

feet in elevation. In contrast, the court heard further evidence that in the 344.99 acre remainder, there were only 10 acres below an elevation of 5 feet, 73 acres at an elevation of between 5 feet and 10 feet, and 262 acres at an elevation of 10 feet or above. This generally low elevation is consistent with the bottomland hardwood stand of timber on the property. Further, the court heard convincing evidence that substantial portions of the subject property are regularly inundated and saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted to a life in saturated soil conditions such that they would be considered wetlands by § 10 of the Rivers and Harbors Appropriation Act of 1899 and § 404 of the Clean Water Act of 1977.

3. In considering the potential of the subject tract for residential or other types of development, a reasonable, prudent, and knowledgeable buyer would consider necessity and likelihood of obtaining a "404" permit from the Corps of Engineers and such consideration would directly influence the purchase price.

4. Kirby called two appraisal witnesses, one of whom was well qualified by background, experience, education, and membership in various learned societies, but with his principal area of expertise near his home in Houston, Texas, and not as much experience in this local area. The other, Hall, while not a member of as many learned societies, had considerable practical experience in the local area. Neither appraisal witnesses Hall nor Dominy viewed the swampy, wetland character of the subject tract as a potential problem which would have entered into the deliberative mind of a hypothetical, knowledgeable and prudent buyer.

Neither appraisal witness Hall nor Dominy believed that the low, swampy, wetland character of the subject property would have been viewed by a knowledgeable and prudent buyer as a potential obstacle that would have influenced market value. This aspect of their testimony was considered by the court as somewhat unusual, because on the west bank of the Neches River, for a stretch of several miles, similar land much closer to the developed areas of Beaumont has been in private ownership for at least one hundred years, and yet no developer has attempted to install any recreational homesites in this similar low-lying, flood-prone land. The only business venture is a barge-supplied gravel and sand operation for about five miles on the west bank of the Neches to the north of the taking.

Further, neither Hall nor Dominy testified to any indepth study evaluation of the wetlands issue.

Nevertheless, Kirby's appraisal witness Hall was intimately familiar with the obstacles to development of wetland areas posed by the "404" regulations as evidenced by his thorough discussion of such obstacles in his 1978 appraisal of the Brown Estate received by the court as impeachment evidence.

5. The riverfront residential developments across the Neches River from the subject tract in Orange County predated the passage of the Clean Water Act and the regulations promulgated thereunder and, accordingly, have not come under the regulation of the Corps of Engineers. In addition, the east bank of the Neches is higher, being the "cut bank."

6. Appraisal witness Hall opined that the highest and best use of the subject property was rural recreational homesite development in the higher areas and timber production in the lower areas. He posited that over 1800 acres, including the island portion of the tract, could be developed into permanent and recreational homesites in conjunction with a wilderness use. The court finds these proposed highest and best uses to be mutually exclusive, inconsistent and not supported by the evidence. Hall offered no evidence of legality, physical adaptability, economic viability, or demand for such development on the date of taking or in the reasonably near future. In fact, the overwhelming evidence before the court is to the contrary.

The court, before rendering these Findings and Conclusions, has made an exten-

sive aerial inspection of the property, terrain, location of recreational homes, topography, accessibility, location availability, size, elevation and access of the lands condemned, and of a substantial number of the comparable tracts. The court also has made a surface inspection (by boat, of course) of the various portions of the condemned tract and viewed the timber, terrain, accessibility, adaptability, "salt water barrier," L.N.V.A. Canal, pump station, and other salient factors of the tracts involved. These were done with the consent of the parties and with the attorneys for the government and the landowner, and during the "dry" and "wet" seasons. The attorney for the landowner opted out of the aerial inspection by helicopter, but consented to the court's inspection.

7. Appraisal witness Dominy testified that in his opinion, the highest and best use of the subject property was for timber production, recreational hunting and fishing, and for recreational residential purposes along Cook's Lake Road and, to some extent (about 500 acres), on the island portion of the tract. Unlike Hall's visions, Dominy's visions of a residential subdivision on the tract were not as ambitious. However, like Hall, Dominy apparently gave little analysis to wetlands regulatory problems, physical constraints, or demand analysis in arriving at his opinion of highest and best use.

8. Government appaisal witness Lefler considered several potential uses of the subject property, and by studying market data, the Anthamatten wetlands report (GX–21), the Polk elevation study (GX–23), the timber cruise of Pomeroy & McGowin (GX–11 through 18), he eliminated all uses but timber production along with limited development along Cook's Lake Road as the highest and best use of the property.

Rather than incorporating or "plugging in" the contributory value of the timber from the Pomeroy and McGowin cruise, Lefler used such estimate as a check upon his own conclusion of contributory timber values gleaned from the market data he reviewed.

9. Appraisal witness Lefler opined that the highest and best use of the subject property was for timber production with a limited potential for rural residential development along Cook's Lake Road in what is Kirby's remainder property. The court finds this to be a logical and reasonable conclusion.

10. The highest and best use of the subject property, both before and after the taking, is for timber production with some limited potential for rural residential development in the remainder area along Cook's Lake Road.

11. When available, market data concerning comparable sales of property are more relevant and competent on the issue of fair market value than any other method of valuation. While other approaches to determine fair market value may be utilized, this court finds that sales of similar property in the open market between willing and knowledgeable buyers and sellers is the most reliable and probative evidence of the fair market value of the property being valued. The "comparables" cited by Hall were of little help to the court. One was a ten-acre tract, hardly comparable to a 2500–acre swampland; and one was in excess of one hundred acres with both freeway frontage, railway access, and above 20 feet, which, for consideration as a comparable tract, was a bizarre choice.

12. Both Dominy's and Hall's opinions, in effect, were a conglomerate approach, although not actually denominated as such. In practical effect, each found a land value and added a timber value to the land. It does not seem that wilderness recreational homesites, if at all plausible and economically sound, would be attractive in a flood plain with all of the merchantable timber removed.

13. The most generally accepted log scale utilized in the East Texas timber market upon which timber is bought and sold is the Doyle Scale. Scribner Scale is also common. The Herring–Devant Log Scale is unique to Kirby.

14. In the East Texas timber market, timber is generally cruised to a "merchant-

able" top above which no merchantable timber can be retrieved. Kirby cruises its own timber to a preestablished fixed top, depending on the diameter of the tree in question.

Kirby classifies its own hardwood trees into one of four grades, grade one being the highest quality sawtimber tree and grade four being the least desirable sawtimber tree (more than 50% unsound). Kirby's grade 3 and 4 hardwood trees are "cull" trees and could possibly be classified as pulpwood trees.

15. Kirby's estimate of the timber volumes on the subject property as of March 26, 1982, was based on a computer model that updated the volumes found by Resource Management Company in 1977. Neither forester who actually performed the 1977 cruise appeared in court. Tom Newman, with Resource Management, did testify and did vouch for the accuracy of the cruise even though he was not present when it was done. Bob Burgess, an ex-Kirby employee who conducted the computer study, had never been on the property in question.

16. "Realized" values are reflective of the revenue a timber company receives for its timber after deducting logging and hauling costs and, by definition, reflect the ingenuity, efficiency, and technology of the individual timber company. The court finds no relationship necessarily exists between such "realized" values and the fair market value of growing timber on the stump in the woods as contemplated by willing and knowledgeable buyers and sellers.

17. Kirby's timber volume evidence generated by computer demonstrated a higher volume of hardwood on the subject property than the Government's timber expert, Tobey Wright. Kirby's computer study utilized Kirby's own internal hardwood classification system which is biased in favor of higher hardwood volumes.

Kirby measured cypress volumes by use of pine volume tables whereas the government's timber expert elected to use hardwood volume tables. As with most facets of timber cruising, this election is a judg-

ment call by timber cruisers and is most reliable when made by an expert who physically inspects the trees.

18. The government's timber expert, Tobey Wright, investigated some thirteen timber transactions, some of them multiple, which occurred in and around the East Texas timber market around the date of taking. All of these are stumpage sales, and taken together as a whole, convince the court that the following are approximate timber values for various classifications and species of timber:

| | |
|---|---|
| pine sawtimber | $200/M.B.F. |
| hardwood sawtimber (including cypress) | $ 80/M.B.F. |
| pine pulpwood | $ 15/cd. |
| hardwood pulpwood | $ 4/cd. |

Considering the above, the timber volume evidence, and the added difficulty in logging many portions of the subject tract, the court finds that the contributory value of the timber to the whole value on the part taken to have been $400.00 per acre, but this is merely a method to check the value of the fee taking, and not to be added to the value of denuded land.

19. As of March 26, 1982, the approximate volume of merchantable timber (Doyle Scale) existing on the subject property was as follows:

In the before condition (2518.57 ac):

| | |
|---|---|
| pine sawtimber | 2,652,700 B.F. |
| hardwood sawtimber | 4,964,800 B.F. |
| pine pulpwood | 544.30 cds. |
| hardwood pulpwood | 26,490.75 cds. |

In the after condition (344.99 ac.):

| | |
|---|---|
| pine sawtimber | 1,041,100 B.F. |
| hardwood sawtimber | 193,000 B.F. |
| pine pulpwood | 360.40 cds. |
| hardwood pulpwood | 2478.05 cds. |

In the taking (2173.58 ac.):

| | |
|---|---|
| pine sawtimber | 1,611,600 B.F. |
| hardwood sawtimber | 4,771.800 B.F. |
| pine pulpwood | 183.90 cds. |
| hardwood pulpwood | 24,012.70 cds. |

20. The court heard from the three appraisal witnesses evidence concerning a total of thirty comparable sales, all of which are set out in the pre-trial order. The court has not considered Lefler's Sale Number One (Wier Gate Lumber Company to Martindale) because it was not an arm's length transaction. The court has not considered

Hall's Sale 3 (Gay to Hughes, 15.21 acres), Sale 6 (Clubb to Wright, 15 acres), Sale 7 (Clubb to Stephenson, 10 acres), and Sale 8 (Kirby to Cole, 5.3 acres) because of their extremely small size in comparison to the subject either before or after the taking. The remaining sales had varying degrees of relevance to the court (both from the standpoint of highest and best use and fair market value).

21. Jerry Dominy appraised the subject tract in its before condition at $1,367.89 per acre. Dominy candidly admitted that he arrived at this figure by adding $658.43 per acre for the timber (supplied by Kirby on the basis of its computer estimate of a 1977 cruise) to his estimate of $709.46 per acre for raw land. While his market data does appear to support $709.46 per acre (Dominy sales 1, 3, 4, 9, 10, 11, and 12), these sales were all totally or partially timbered. His addition of Kirby's timber value to this $709.46 thus arrived results in double counting the contributory timber component, and graphically illustrates the flaws inherent in his additive appraisal approach.

22. In May 1978, Kirby appraisal witness Hall appraised the subject taking at $850 per acre, or $2,118,710. In March 1979, only ten months later, Hall miraculously discovered the land value had almost doubled, and in the first trial of this case, he opined that the fair market value of the taking was $1,600 per acre, or $3,490,000. Finally, in June 1987, in the retrial of this case, Hall testified that the fair market value of the subject taking was $1,856.78 per acre as of the date of taking, or $4,040,000.

23. Willard Hall found the before value of the subject property to have been $1,858.43 per acre, or $4,680,586. He determined this acreage value by adding $658.43 per acre for the timber to $1200 per acre for the land. Hall's comparable sales data does not support $1200 per acre for bare land even if such "piecemealing" was an appropriate appraisal methodology, which the court holds is not appropriate.

In Hall's appraisal of the 344.99 acre remainder, he arrived at an opinion of $2000 per acre, or $689,980. None of the market data offered by Hall supports such a generous estimate.

24. Kirby witnesses Hall and Dominy each added a figure of $658.43 per acre for timber to their respective land values in order to arrive at the fair market value of the subject property before the taking. (Dominy: $658.43 + $709.46 = $1,367.89; Hall: $658.43 + $1,200 = $1,858.43). See DX–12 and 14, respectively. The $658.43 was provided to them by Kirby. The court views both of these approaches as impermissible additive appraisals.

25. M.L. Lefler did a proper before and after appraisal of the subject property. His opinion of the fair market value before the taking was $2,054,933.10, or the equivalent of $815.91 per acre. Lefler arrived at these values by focusing on what he deemed to be value differentials of areas at different elevations. He assigned a value of $1850 per acre for the 364 acres above ten feet in elevation, $700 per acre for the 1970.99 acres below 10 feet in elevation, and $10 per acre for the 184 acres of permanent lakes. While this methodology is somewhat imprecise, the court finds it to be a rational one considering the diverse topography of the subject tract. One hundred eighty-four acres of continually submerged land is not worth the same as one hundred eighty-four acres of pine and hardwood timberland.

Lefler followed the same methodology for the remainder and found its fair market value to be $524,715.10, or $1,520.95 per acre.

Lefler's market data adquately supports these conclusions.

26. Government witness Lefler appraised the adjoining tract formerly owned by Temple–Eastex in June 1984, at a higher value than he placed on the subject property. However, even though the tracts are contiguous, there are differences in the two tracts. The Temple–Eastex tract contains significantly less wetland area as can easily be discerned from the infrared color photographs (GX–4C, 5C, and 6C). According to Lefler, the highest and best use of the Temple–Eastex tract included a greater de-

velopment potential because of its higher elevation.

Even though the Temple tract and the Kirby tract were somewhat similar, there remain enough differences that a lack of a complete reconciliation of the two appraisals does not serve to impeach the credibility of Mr. Lefler. Accordingly, the court finds the Temple-Eastex appraisal of little probative value in evaluating Lefler's credibility concerning his opinion of the fair market value of the subject property.

27. The fair market value of the whole 2518.57 acres before the taking was $2,518,570 ($1000 per acre) as of the date of taking.

The fair market value of the 344.99 acre remaining after the taking was $517,485 ($1500 per acre), as of the date of taking.

The fair market value of the 2173.58 acres taken is the difference of the above which equals $2,001,085 ($920.64 per acre).

## CONCLUSIONS OF LAW

1. The Fifth Circuit reversed this case and remanded it to this court "for further findings ...," and for "a determination of the various issues raised by the parties, with instructions to follow the guidelines established by *Merz* and its progeny." 696 F.2d at 358. Reconsideration of the factual issues upon which the Commission originally based its award has convinced the court that the award of the commissioners was clearly erroneous.

2. A Corps of Engineers "404" permit would not be required in order to conduct normal silviculture activities on those portions of the subject property that fall within the definition of "wetlands."

3. Well over one-half of the property taken is of such an elevation and biological character that it would fall within the definition of "wetlands" under the Clean Water Act and as such term is defined at 33 C.F.R. § 323.2(a)(3).

4. Any non-silvicultural development in the wetland portions of the subject tract would require a "404" permit if it involved the discharge of dredge and/or fill activities as those terms are defined at 33 C.F.R. § 323.2(c), (d), (e), and (f). This would include site preparation, road construction, sewage treatment facilities, culverts, and the like.

5. Any rural residential development such as that contemplated by witnesses Hall and Dominy on the subject property would require a "404" permit under 33 C.F.R. § 323.3 to the extent that they would be located in wetland areas or in nonwetland areas, access to which would require road building across wetland areas.

6. Under the unit rule of valuation, condemned property is to be first valued as a whole after which the contributory values of the component parts may be estimated. However, separately appraising individual components of value and adding them together to reach the whole value is a piecemeal approach which can easily result in double-counting and is impermissible.

7. Condemned property should be valued *in rem* and not *in personam*. The court must consider and value the land itself without regard to the particular circumstances of the owner or owners.

8. "Fair market value" which includes all the value the market place perceives a piece of property to have, plus a premium of 25% more for uniqueness of the property is redundant and offends the notion of fairness. The 25 percent premium for uniqueness was testified to by George Stanley, a retired vice president of Kirby who testified the tract condemned was in effect "virgin" forest. Testimony developed on trial, however, showed the tract had been logged in prior years at least twice, possibly three times, albeit the last time was over thirty years before the taking.

9. Fair market value of the condemned property should be based upon its highest and best use because willing buyers and willing sellers would consider the highest and best use in an actual transaction in the marketplace in agreeing on a purchase price. Highest and best use includes a tract's present use and any prospects of other uses to which the property is

physically adapted in the present or in the reasonably near future and for which there is a demonstrated demand. A proponent of such a higher use has the burden of showing the land is physically adaptable to the use, the need and demand for such use in the reasonably near future, and that such use or uses are legally permissible ones.

10. Insofar as any Finding of Fact, *supra,* may be construed as a Conclusion of Law, it is hereby adopted as such.

Counsel for the prevailing party is directed to submit a judgment consistent with these findings and conclusions.