99 F.3d 1140
 44 ERC 1946
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
6.24 ACRES OF LAND, et al., Defendants-Appellants.
 No. 95-3183.
 United States Court of Appeals, Sixth Circuit.
 Oct. 22, 1996.
 
 Before: SILER and COLE, Circuit Judges; BELL, District Judge.*
 PER CURIAM.
 
 
 1
 The owners of a twenty-eight acre parcel of land neighboring the Fernald nuclear facility appeal the district court's approval of a compensation award made pursuant to the government's taking of 6.24 acres of that land for installation of a groundwater remediation system. For the following reasons, we affirm the district court's approval of the $36,725 award recommended by the court-appointed lands commission.
 
 I.
 
 2
 On February 8, 1993, the United States filed an eminent domain action to acquire an easement on 6.24 acres of a 28.6-acre tract of land owned by Earl and Margaret Weber ("the Webers") in Hamilton County, Ohio. The government required the easement to install recovery wells, valve pits, monitoring wells and other groundwater clean-up equipment. Groundwater in the area had been contaminated with uranium from the nearby Fernald nuclear facility operated by the U.S. Department of Energy. The Webers took part in a class action suit against the Fernald facility to obtain compensation for property-value diminution resulting from the groundwater contamination. They received a total of $310,000 for the loss of property value due to the contamination and any stigma associated with the property's proximity to the Fernald facility. In addition to compensation for the contamination on their property, the Webers were also entitled to compensation for the easement on their property and damages associated with the easement. This suit involves the issue of how much compensation is appropriate for this easement and any related damages.
 
 
 3
 The Webers' property is a rectangular-shaped parcel zoned for industrial use. The parcel is marked by a steep 75-foot slope from a lower plateau to an upper plateau. The upper plateau encompasses 11.3 acres while the lower tract contains approximately 15.3 acres. The government's easement is located on the back portion of the upper plateau. On the lower portion, the Webers operate a recycling business in a 48,000 square foot building. Behind the recycling facility, the Webers store old cars, machinery and other scrap metal in preparation for recycling. The upward slope is covered with trees. The lower portion is accessible through a driveway leading from the public road. No public or paved road provides access to the upper plateau.
 
 
 4
 After the government initiated its taking, the compensation issue was submitted to a three-member commission ("the Commission") appointed under Fed.R.Civ.P. 71A(h). The Commission visited the site and heard testimony from appraisers and from experts familiar with the remediation system.
 
 
 5
 The Webers presented the testimony of one appraiser, E. Pike Levine, who stated that the pre-taking value of the entire parcel was $505,000 and the post-taking value was zero. Accordingly, he testified that the amount of compensation due to the Webers was $505,000. Mr. Levine based his post-taking valuation on the resultant "stigma" associated with the groundwater remediation equipment. The government presented two appraisers who testified that the parcel had pre-taking values of $370,000 and $495,000, respectively. The government appraisers testified to after-taking values of $356,400 and $486,888. Therefore, the appraisers recommended compensation totalling $13,600 and $8,112, respectively.
 
 
 6
 The Commission discredited the value suggested by the Webers' appraiser as "incredible." The Commission found that the government appraisers, on the other hand, had presented estimates which were too low. Accounting for the total effect of the clean-up equipment on the remaining portion of the upper plateau, the Commission determined the appropriate compensation to be $36,725.
 
 
 7
 Over the Webers' objections, the district court approved the Commission's report recommending the $36,725 level of compensation on December 14, 1994. The Webers filed this appeal arguing that the district court erred in approving the Commission's report because (1) it artificially subdivided the property into two parcels for valuation purposes in violation of the "unit rule;" and (2) it failed to account for diminution in value caused by "fear" or "apprehension" associated with the clean-up equipment.
 
 II.
 
 8
 The findings of a land commission must be accepted by a reviewing court unless clearly erroneous. Fed.R.Civ.P. 53(e)(2), 71A(h); United States v. Merz, 376 U.S. 192, 198 (1964). This includes a commission's findings as to the value of land. United States v. Werner, 916 F.2d 175, 178 (4th Cir.1990). A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court based on the entire evidence is left with the definite and firm conviction that a mistake has been committed. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985).
 
 
 9
 Weighing evidence in a condemnation proceeding is left to the trier of fact, and as a reviewing court we must not reweigh the evidence. United States v. 6,162.78 Acres of Land, 680 F.2d 396, 398 (5th Cir.1982). Therefore, commission findings based on conflicting evidence are binding on the reviewing court. United States v. 1,606.00 Acres of Land, 698 F.2d 402, 405 (10th Cir.1983). "[O]vercompensation is as unjust to the public as undercompensation is to the property owner, and the landowner bears the burden of proving the value of the land." United States v. L.E. Cooke Co., 991 F.2d 336, 341 (6th Cir.1993) (citing United States v. 69.1 Acres of Land, 942 F.2d 290, 292 (4th Cir.1991)); see also United States v. 901.89 Acres of Land, 436 F.2d 395, 399 (6th Cir.1970), cert. denied, 402 U.S. 973 (1971).
 
 III.
 
 10
 The Webers first argue that the Commission erred by artificially subdividing the subject property into two parcels in violation of the "unit rule." The development of the unit rule was based on the premise that just compensation for condemned property should be "just" both to the owner of the property and to the public which pays the bill. United States v. 499.472 Acres of Land, 701 F.2d 545, 549 (5th Cir.1983). Therefore, the government should not have to pay more for the property than a private purchaser simply because the government is exercising its condemnation power on the public's behalf. Id. The unit rule recognizes that while a landowner is entitled to have all factors affecting the value of the land considered, the owner is not entitled to have the factors added together and to have the total taken as the market value of the property. United States v. 91.90 Acres of Land, 586 F.2d 79, 87 (8th Cir.1978), cert. denied, 441 U.S. 944 (1979). Condemned property must be valued as a single, integrated whole, and not based on its individual components. 499.472 Acres of Land, 701 F.2d at 549.
 
 
 11
 Courts have employed the unit rule in situations where improvements such as man-made structures or unique resources such as minerals possess independent value. See id.; 91.90 Acres of Land, 586 F.2d at 87. It has also been applied when relevant in valuing property with joint ownership interests. See State of Nebraska v. United States, 164 F.2d 866, 868 (8th Cir.1947), cert. denied, 334 U.S. 815 (1948). For example, improvements on a farm can be a factor to consider in determining the farm's market value. But it is improper to value the farmland as one factor and then value the improvements as another factor, and then add those two values together in determining the market value. 91.90 Acres of Land, 586 F.2d at 87. See also United States v. 8.41 Acres of Land, 680 F.2d 388, 395 (5th Cir.1982) (value of separate interests cannot exceed worth of the whole); United States v. 2,175.86 Acres of Land, 687 F.Supp. 1079, 1088 (E.D.Tex.1988) ("separately appraising individual components of value and adding them together to reach the whole value is a piecemeal approach which can easily result in double-counting and is impermissible").
 
 
 12
 In the present case, the district court's instructions to the Commission properly described the measure of just compensation for a partial taking as "the difference between the fair and reasonable market value of the entire tract of land immediately before the taking and the fair and reasonable market value of the portion that remains after the taking." See United States v. Banisadr Bldg. Joint Venture, 65 F.3d 374, 378 (4th Cir.1995). The Commission heard testimony from the government's two appraisers and the Webers' appraiser whose estimates of the "before" value of the land ranged from $370,000 to $505,000. The Webers contend that the Commission subsequently erred in determining the "after" value of the land by dividing it into two separate parcels to calculate just compensation. The Webers' argument is based on the Commission's description of the property as divided into an upper and a lower plateau. They contend that just as owners should not obtain larger awards by valuing elements of their property separately, the Commission should not be permitted to separately value elements of their property to diminish their award.
 
 
 13
 We are not persuaded by the Webers' argument. Assuming that the unit rule is applicable to the facts of the present case, the record shows the Commission properly considered the "before and after" value of the Webers' land. The fact that a parcel of land has natural features which frame any discussion of the parcel's characteristics does not defeat valuation which is otherwise based on the parcel's value as a whole. Indeed, the landowner is entitled to have the Commission take into account all factors that would affect the market value of the property. 91.90 Acres of Land, 586 F.2d at 87. Accordingly, the Commission determined that the government's appraisers did not adequately assess the easement's adverse impact on the adjoining 5.06 acres located on the upper plateau of the property. The Commission therefore increased the Webers' award above that recommended by the government's appraisers, determining that the 5.06 acres were rendered essentially useless. However, the Commission concluded that there was no diminished use to the 15.3-acre lower plateau and the 75-foot steep slope leading to the upper plateau.
 
 
 14
 "When the Government has physically acquired through its eminent domain powers a portion of a distinct tract of property, 'the compensation to be awarded includes not only the market value of that part of the tract appropriated, but the damage to the remainder resulting from the taking, embracing, of course, injury due to the use to which the part appropriated is to be devoted.' " United States v. 14.38 Acres of Land, 80 F.3d 1074, 1077 (5th Cir.1996) (quoting United States v. Grizzard, 219 U.S. 180, 183 (1911)). To determine any such injury caused by the taking on the subject property, the Commission necessarily looked at the distinct features of the Webers' land and then arrived at the after-taking value for the land as a whole. In so doing, the Commission did not violate the spirit nor application of the unit rule as employed by the courts. See 499.472 Acres of Land, 701 F.2d at 549; 91.90 Acres of Land, 586 F.2d at 87; State of Nebraska, 164 F.2d at 868; 8.41 Acres of Land, 680 F.2d at 395; 2,175.86 Acres of Land, 687 F.Supp. at 1088. Accordingly, the Webers' argument that the Commission violated the unit rule lacks merit and the district court did not commit clear error in accepting the Commission's report in this regard.
 
 IV.
 
 15
 The Webers also contend that the Commission failed to account for the diminution in market value caused by fear and apprehension associated with the clean-up equipment located on the easement. Where a taking diminishes the value of the land that remains, "[s]uch damage is often, though somewhat loosely, spoken of as severance damage." United States v. Miller, 317 U.S. 369, 376 (1943). However, it is improper to think of "severance damage" as a separate item of just compensation apart from the "before and after" valuation of the land. 91.90 Acres of Land, 586 F.2d at 86. In a partial taking, the before and after method of calculation automatically incorporates the concept of severance damages. United States v. 38.60 Acres of Land, 625 F.2d 196, 199 n. 2 (8th Cir.1980). "[I]f fear of a hazard would affect the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller, diminution in value caused by that fear may be recoverable as part of just compensation." United States v. 760.807 Acres of Land, 731 F.2d 1443, 1447 (9th Cir.1984). However, severance damages based wholly on speculation and conjecture are precluded. Olson v. United States, 292 U.S. 246, 257 (1934). The landowner has the burden of proof in establishing the damage. Hicks v. United States, 266 F.2d 515, 519 (6th Cir.1959).
 
 
 16
 The Webers rely on the testimony of their appraiser, E. Pike Levine, who stated that the property had been made worthless by the stigma associated with the clean-up equipment. The Commission dismissed Levine's conclusion as "incredible." Based on the evidence presented to the Commission, we are not persuaded that it clearly erred in refusing to credit this testimony.
 
 
 17
 First, the fact that the Webers continue to operate an industrial facility on the property is fatal to the credibility of Levine's conclusion that the property is worthless. Second, while Levine acknowledged that his expertise was in the real estate market and not in remediation systems, he nonetheless offered testimony drawing unsubstantiated conclusions about the risks involved with the system:
 
 
 18
 There's a risk--there's an increase in the risk due to probable breakdown of the re-core, re-ore remedial well system ... there's no such thing as perfect, we don't even have it in spaceships, the seams, the capping off, the joints is [sic] usually where the leaks start, so I felt that in conjunction with that, and it's an attractive nuisance, an attractive nuisance in the sense that it's attractive to children and vandals getting into the facility ... Possibly pumps will rust, they erupt and there's vent leakage from the vent, which in a sense causes an inhalation problem. And then there's also the increased risk of legal action on behalf of anybody ...
 
 
 19
 When questioned about the foundation for his assertion that the breakdown of the recovery well was probable, Levine responded: "Well, I just went by experience. Stuff breaks down every day, the best of the most expensive types of lines and equipment ..."
 
 
 20
 Levine's speculation was refuted by a number of government witnesses with expertise in such remediation systems. Dr. John R. Frazier, a radiation scientist and health physicist, testified that the concentrations found in the groundwater do not constitute a radiation hazard, and that even if they were, there is no pathway for their exposure to the public. Harvey A. Svetlik, an engineer with expertise in polyethylene pipe, testified as to the strength and longevity of the polyethylene pipe used in the remediation system. Svetlik stated that the pipe used in the remediation system in question could withstand severe stress, even that associated with an earthquake, and that it is capable of lasting well beyond 114 years. Mr. Raymond Schweitzer, whose firm was involved in construction of the remediation project, testified that the project's automatic cut-off system would shut off the pumps should the system be breached. He stated that the contaminated water would return to the aquifer when the pumps are shut off. Schweitzer also testified that the land was graded to direct water away from the lower portion of the property. Mr. Stephen Hurley, a Field Engineer, testified concerning the inspection of materials and workmanship that went into the project, as well as the successful pressure test of the system. The Commission in its report stated that it found the testimony of these government witnesses to be persuasive and found the possibility of any radiation contamination from the project to be "speculative and remote."
 
 
 21
 The Webers argue that whether rational or not, fear and apprehension may still impact a prospective purchaser's valuation of their property. They point to general public fear over uranium contamination and cite to this court's opinion in United States ex rel. TVA v. Easement and Right of Way, 405 F.2d 305 (6th Cir.1968). In Easement and Right of Way, we held that a district judge could properly determine that certain segments of the buying public may be apprehensive about the safety of high voltage lines and therefore be unwilling to pay as much for potential residential property, despite "studies that may show objectively the complete safety of these structures ..." Id. at 309. The Webers also cite to our decision in Hicks, where we held that the apprehension of injuries created by the presence of power lines is founded on practical experience and "may be taken into consideration" in determining market value of the affected land. Hicks, 266 F.2d at 521. The Webers argue that these cases stand for the proposition that the landowner need not prove the reasonableness of any fear that has been created. However, generalized fear or apprehension about a potential hazard is insufficient. Rather, diminution in value caused by fear may be recoverable when such fear affects the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller. 760.807 Acres of Land, 731 F.2d at 1447. We assume that buyers and sellers of ordinary prudence are knowledgeable and that they are not motivated by speculation or conjecture. Id. at 1446.
 
 
 22
 While Mr. Levine presented testimony that his conclusions about the stigma associated with the remediation system were based in part on interviews with neighbors residing near the Webers' property, the record does not reflect that these individuals were potential purchasers of the industrial property at issue. The government's appraisers, on the other hand, based their conclusions on comparison with industrial property affected by groundwater contamination and interviews of market participants involved with the purchase of industrial commercial property. In fact, Mr. Jackson's interviews would support a conclusion that some potential industrial purchasers would view the presence of a remediation system as positive. Additionally, Mr. Jackson testified that any stigma associated with the land in question existed before the taking.
 
 
 23
 Therefore, the record is devoid of evidence to suggest that the buying public fears the remediation system which was put in place to clean up contamination in the area. Accordingly, we cannot conclude that the Commission clearly erred in crediting the government's evidence as to the potential fear and apprehension associated with the property over that presented by the Webers.
 
 V.
 
 24
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation